Cuomo v New York State Commn. on Ethics & Lobbying in Govt. (2025 NY Slip Op 00902)

Cuomo v New York State Commn. on Ethics & Lobbying in Govt.

2025 NY Slip Op 00902

Decided on February 18, 2025

Court of Appeals

Rivera

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 18, 2025

No. 1 

[*1]Andrew M. Cuomo, Respondent,
v
New York State Commission on Ethics and Lobbying in Government, Appellant.

Dustin J. Brockner, for appellant.
Gregory J. Dubinsky, for respondent.
New York City Bar Association et al., amici curiae.

RIVERA, J.

The issue on this appeal is whether, on its face, the Ethics Commission Reform Act of 2022 unconstitutionally vests the State Commission on Ethics and Lobbying in Government with executive power. Plaintiff's principal argument is that because the Commission exercises executive power, the Governor must have power to appoint and remove the Commissioners. In New York, however, the Legislature—not the Governor—may ordinarily define the terms on which non-constitutional state officers may be appointed and removed. Moreover, the Legislature structured the Commission to address a narrow but crucial gap arising from the inherent disincentive for the Executive Branch to investigate and discipline itself, which has serious consequences for public confidence in government. The Act does not displace the Executive Branch to accomplish that goal; instead, it confers upon an independent agency power to enforce a narrow set of laws, thus mitigating the unique danger of self-regulation. The Act addresses a threat to the legitimacy of government itself with an extraordinary response. While the Act extends very close to the boundary of permissible legislation, it is not "intrinsically a constitutional affront to the separation of powers doctrine" [*2](Cohen v State, 94 NY2d 1, 15 [1999]). We therefore conclude that the Act is not unconstitutional in every conceivable application.
Plaintiff's secondary arguments are likewise unavailing. The Commission's placement within the Department of State does not violate Article V of the State Constitution. The Court has previously recognized the propriety of independence from the departmental head where necessary to achieve the purposes of a new entity and the Commission falls squarely within that precedent. And, despite what plaintiff contends, the Commission's power to investigate the Governor and possibly impose a fine does not interfere with the Legislature's impeachment power. Accordingly, we conclude that plaintiff has not carried his burden and reverse the order of the Appellate Division.
I.
A.
Judicial Commission on Public Ethics
In 2011, in response to highly public cases of unchecked corruption and graft at the highest levels of New York State government, then-Governor, and plaintiff on this appeal, Andrew M. Cuomo and the Legislature agreed to create an agency responsible for enforcing the state's ethics and lobbying laws against legislative and executive officials, among others.[FN1] The Governor proposed and the Legislature enacted former Executive Law § 94, which established within the Department of State the Joint Commission on Public Ethics (JCOPE) (see former Executive Law § 94). Its fourteen members generally served five-year terms and were appointed as follows: six by the Governor and the Lieutenant Governor; and eight by the Legislature, with three each appointed by the Senate's Temporary President and the Assembly's Speaker and one each by the Senate's and the Assembly's Minority Leaders (see id. § 94 [2]). Of the six members appointed by the Executive Branch, at least three had to belong to a political party different from the Governor's (see id.). Members were removable by the appointing official if that official determined there was good cause (see id. § 94 [7]). The Governor was authorized to "designate the chair[person] of the commission," who held that position at the Governor's pleasure (id. § 94 [4]).
Early in its establishment and throughout its tenure, JCOPE was criticized for its lack of independence and ineffectiveness. Good-government advocates argued that JCOPE suffered fundamental structural deficiencies. They noted the deleterious effects of what was commonly called the "special vote" or "minority veto," which limited JCOPE's ability to investigate certain officials (see e.g. Danny Hakim & Thomas Kaplan, Though Hailed, Albany Ethics Deal Is Seen as Having Weaknesses, NY Times, June 6, 2011, § A at 24). For example, under one of the "special vote" provisions, when a JCOPE member sought to investigate a statewide elected official or a direct appointee of such an official, JCOPE's members had to approve the action by a majority, including two of the Governor's three appointees (see former Executive Law § 94 [13] [a]). This meant that two of the Governor's politically aligned appointees could block an investigation of the Governor, even if the remaining 12 members voted to investigate. An analogous provision restricted investigations into legislative officials unless at least two members who voted to authorize the investigation were appointed by a legislative leader from the same party as the subject of the investigation (see id.). Observers also raised concerns about the appointments process and individual members' independence, including the Governor's authority to appoint the Chair, the appearance of appointments based on political relationships rather than experience and ability, and removal by the appointing official based on easily manipulated grounds (see e.g. Mike Vilensky & Josh Dawsey, Ethics [*3]Panel under Fire, Wall St J, Jan. 31, 2015, § A at 15). These criticisms gained purchase as cases of corruption and misuse of power continued to surface, leading to resignations and criminal prosecutions while JCOPE remained on the sidelines.
B.
Commission on Ethics and Lobbying in Government
At the 2022 State of the State Address, a new Governor declared that "JCOPE is irreparably broken and has failed to earn the public's trust." The Governor specifically identified the "special vote" and the appointments process as requiring change and proposed a new ethics law as part of the 2022-2023 budget. The Legislature thereafter enacted and the Governor signed into law the Ethics Commission Reform Act of 2022 (the Act), which amended Executive Law § 94 and replaced JCOPE with the Commission on Ethics and Lobbying in Government. Like JCOPE, the Commission is established in the Department of State and charged with the investigation and enforcement of the ethics and lobbying laws (see Executive Law § 94 [1] [a]). Those under the Commission's jurisdiction include statewide elected officials; members and employees of the Legislature; certain statutorily defined state officers and employees; current and former candidates for statewide office, Senate, and Assembly; the political party chair; and current and former lobbyists and their clients (id.). The Commission also enforces financial disclosure requirements and reviews disclosure forms of statewide elected officials, their officers and employees and other persons subject to disclosure under Public Officers Law 73-a (see Executive Law § 94 [9]). As part of its specific grant of authority under the Act, the Commission has rulemaking power to "adopt, amend and rescind any rules and regulations pertaining to" Public Officers Law § 73 (concerning official ethics), Public Officers Law § 73-a (financial disclosure), Legislative Law Article 1-a (lobbying) and Civil Service Law § 107 (political activities and contributions) (Executive Law § 94 [5] [a]). With respect to members and employees of the Legislature, the Commission's powers are limited: the Commission may investigate such persons but must refer any potential violations of the ethics laws to the legislative ethics commission (see id. § 94 [10] [p] [i]).
The 11 members of the Commission are appointed to four-year terms as follows: three members are nominated by the Governor; two by the Temporary President of the Senate; one by the Minority Leader of the Senate; two by the Speaker of the Assembly; one by the Minority Leader of the Assembly; one by the Attorney General; and one by the Comptroller (id. § 94 [3] [a]).[FN2] Thus, five members are appointed by Executive officials and six by legislators.
The Act provides that each nominee must be approved by an Independent Review Committee (IRC), composed of the state's accredited law schools' deans or their designees (see id. § 94 [2] [c]).[FN3] The IRC "review[s] the qualifications of the nominated candidate" and "[t]hose candidates that the [IRC] deems to meet the qualifications necessary for the services required based on their background and expertise . . . shall be appointed." If the IRC does not approve a nominee, the appointing official nominates another person (id. § 94 [3] [d]). The Act expressly prohibits appointment of a person who is, or within the last two years was, a registered lobbyist, a legislative employee or member, a statewide elected official, or a qualifying State officer or employee (see id. § 94 [3] [e]).
Whereas JCOPE members could be removed by their appointing authority, Commission members may be removed under the Act only by a majority vote of the Commission (see id. § 94 [4] [c]). Removal is limited by statute to cases where there is good cause—substantial neglect of duty, misconduct in office, violation of confidentiality restrictions, inability to discharge the powers or duties of office or violation of the Act—and must follow written notice and opportunity for a reply (id.).
Another significant difference is the omission of the "special vote" provisions. Under the Act, the Commission may initiate an investigation of the ethics and lobbying laws by simple majority vote (see id. §§ 94 [4] [h], [10] [c], [d], [f]).
If the Commission concludes that there is credible evidence of a violation, it provides the subject of the investigation with the opportunity for a hearing before an independent arbitrator, who may hear sworn testimony and receive evidence (see id. §§ 94 [10] [h], [i]). After the hearing, the Commission decides whether there exists a substantial basis to find a violation (see id. § 94 [10] [p]). Upon such finding, the Commission may impose civil penalties, which are capped at either $10,000 or $40,000, depending upon the nature of the violation, plus the value of any gift, compensation, or benefit received as a result of the violation (see id. §§ 94 [10] [n] [i], [ii]). The Commission may also refer a matter for criminal investigation upon a finding of sufficient cause (see id. § 94 [10] [n] [iv]). If the Commission concludes that a person who is neither a member of the Legislature, a legislative employee, nor a candidate for the Legislature has violated the ethics or lobbying laws, the Commission may, "in addition to or in lieu of any fine authorized by [the Act]," refer the matter "to their employer for discipline with a warning, admonition, censure, suspension or termination or other appropriate discipline" (id. § 94 [10] [p] [ii]).
II.
In 2020, during his tenure as Governor, plaintiff sought approval from JCOPE to publish a book, which JCOPE granted, and the book was published later that year. In 2021, JCOPE notified plaintiff that he may have violated Public Officers Law § 74 (3) (a), (b), (c), (d), and (h), by "abus[ing] [his] State position for personal benefit, including but not limited to utilizing State property, personnel or other resources of the State for activities associated with the book and promoting the book during State appearances" (Cuomo v New York State Joint Commn. on Pub. Ethics, 76 Misc 3d 1036, 1041 [Sup Ct, Albany County 2022]). Plaintiff denied any violation. After plaintiff's resignation, JCOPE issued plaintiff a notice of investigation and hearing. When the Commission replaced JCOPE, it authorized continuation of the investigation into plaintiff and scheduled a hearing.
Plaintiff then filed this action against the Commission seeking a judgment declaring the Act facially unconstitutional and enjoining the investigation. Plaintiff asserted that the Act violates constitutional principles of separation of powers because the Commission exercises investigatory and enforcement powers constitutionally entrusted to the Executive, without sufficient oversight by the Governor. Plaintiff also asserted that the Act violates Article V of the State Constitution because, although the Commission is formally within the Department of State, it functions as a separate department without a head appointed by the Governor with the advice and consent of the Senate. Finally, plaintiff claimed that the Act unconstitutionally displaces the constitutional impeachment process, by permitting the Commission to sanction the Governor for putative violations of the Public Officers Law.
Plaintiff moved for a preliminary injunction and the Commission cross-moved for summary judgment. Supreme Court declared unconstitutional the investigation and enforcement provisions of the Act (Executive Law §§ 94 [5] [a], [c]; [10]; [14]) and enjoined the proceedings against plaintiff (81 Misc 3d 246 [Sup Ct, Albany County 2023]). The Appellate Division stayed the order pending resolution of the Commission's appeal, except insofar as Supreme Court enjoined the hearing proceeding against plaintiff (2023 NY Slip Op 75090[U] [3d Dept 2023]). The Appellate Division thereafter affirmed, concluding that the Act violates the separation of powers by encroaching on the powers of the Executive Branch to expand those of the Legislature (228 AD3d 175 [3d Dept 2024]). The Appellate Division granted the Commission's motion for leave to appeal to this Court and certified the question whether it erred in affirming the order of Supreme Court.[FN4]
[*4]III.
A.
Duly enacted legislation is entitled to a strong presumption of constitutionality (see White v Cuomo, 38 NY3d 209, 216 [2022], citing Dalton v Pataki, 5 NY3d 243, 255 [2005]; Schulz v State, 84 NY2d 231, 241 [1994]; Van Berkel v Power, 16 NY2d 37, 40 [1965]; In re Fay, 291 NY 198, 207 [1943]). Moreover, "all the legislators and the Legislature itself are entitled to the presumption that they act only in accordance with the fulfillment of their oaths of office" (Cohen, 94 NY2d at 13). Plaintiff, as the party challenging the constitutionality of the Act, has a heavy burden to establish its unconstitutionality (see Stefanik v Hochul, — NY3d &mdash, &mdash, 2024 NY Slip Op 04236, *3 [2024]; People v Viviani, 36 NY3d 564, 576 [2021]). On this facial challenge, plaintiff must establish "in any degree and in every conceivable application, the law suffers wholesale constitutional impairment" (White, 38 NY3d at 216 [internal quotation marks omitted]). There are no facts in dispute, and thus summary judgment in the Commission's favor is warranted if plaintiff fails to establish that, in every possible case, the Act is unconstitutional.
Plaintiff argues that the Act is facially unconstitutional because it empowers the Commission to exercise quintessentially executive powers free from gubernatorial accountability. Plaintiff focuses on the absence of statutory authority for the Governor either to appoint a majority of the Commissioners or to remove any of them. The Commission, plaintiff claims, is controlled by "legislative agents." The Commission principally responds that New York's constitution permits the Legislature to vest some executive power with politically independent bodies to meet practical demands and that enforcing ethics and lobbying laws against executive officials requires such autonomy.
We conclude that plaintiff has failed to establish the facial unconstitutionality of the Act. Three factors compel our decision. First, our separation of powers doctrine is flexible and based on a commonsense view of the workings of government, thus allowing for some overlap between the coordinate branches. Second, New York's Governor does not have sole and unlimited powers to appoint or remove state officers because our State Constitution disperses those powers between the Legislature and the Governor. Third, the integrity of our constitutional design depends on the public's trust in government, and the Act provides an additional ethics enforcement mechanism narrowly targeted to the problems inherent in the Executive Branch's self-regulation.
[*5]B.
i.
Separation of Powers is a Flexible Doctrine
"Because any 'assign[ment] by law [of] new powers and functions to . . . commissions" is [s]ubject to the limitations contained in [the state] constitution,' we must . . . consider whether the enabling act violates the separation of powers doctrine" (Delgado v State, 39 NY3d 242, 255 [2022 plurality], quoting NY Const art V, § 3 [citation omitted]). "The doctrine has deep, seminal roots in the constitutional distribution of powers among the three coordinate branches of government" (Cohen, 94 NY2d at 11, citing NY Const, art III, § 1; art IV, § 1; art VI, § 1; Clark, 66 NY2d at 189). "[O]ne of the plain purposes of the separation of powers theory is to guard against one Branch seeking to maximize power" (Cohen, 94 NY2d at 13, citing Charles D. Breitel, The Lawmakers, in 2 Benjamin N. Cardozo Memorial Lectures, at 798; see Delgado, 39 NY3d at 271 [Wilson Ch. J., concurring]). "[I]t is the correlative oversight of each lawmaking Branch over one another—in essence a dependency, rather than a separation—that balances the overall power to protect the public's interests, not those individuals who occupy the offices of those Branches at varying times" (Cohen, 94 NY2d at 13). "While the doctrine [ ] does not require the maintenance of three airtight departments of government, it does require that no one branch be allowed to arrogate unto itself powers residing entirely in another branch" (Under 21 v City of New York, 65 NY2d 344, 356 [1985] [internal quotation marks and citations omitted]).
Contrary to the dissent's view, the maxim that the separation of powers "is necessary for the preservation of liberty itself" does not require the dissent's rigid analytical framework (dissenting op at 7). As Justice Story explained, the separation of powers does not demand that the branches "must be kept wholly and entirely distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree" (see Dreyer v Illinois, 187 US 71, 84 [1902], quoting Joseph Story, Commentaries on the Constitution of the United States 393 [5th ed 1891]). Instead, as the Court has continually reaffirmed, "it is institutional interdependence rather than functional independence that best summarizes the American idea of protecting liberty by fragmenting power. The genius of the system is synergy and not 'separation,' in the common connotation of that latter word" (Cohen, 94 NY2d at 13-14 [internal quotation marks and citations omitted]; see also Dreyer, 187 US at 84).
We are guided here by "this Court's long-standing and steadfast refusal to construe the separation of powers doctrine in a vacuum" (Bourquin v Cuomo, 85 NY2d 781, 785 [1995]). Instead, we "view[ ] the doctrine from a commonsense perspective" (id.). Indeed, the "exigencies of government have made it necessary to relax a merely doctrinaire adherence to a principle so flexible and practical, so largely a matter of sensible approximation, as that of the separation of powers" (Matter of Richardson, 247 NY 401, 410 [1928] [Cardozo, Ch. J.]). Thus, as our caselaw makes clear, the branches are not hermetically sealed and " 'some overlap' " (Bourquin, 85 NY2d at 785, quoting Clark, 66 NY2d at 189) is permissible so long as core duties and responsibilities are retained. Each of our cooperative branches has a particular role that serves our constitutional design, which strikes a carefully balanced relationship among the three that provides for a check on governmental overreach.[FN5]
[*6]ii.
Power of Appointment and Removal
Under our state's constitutional scheme, the Governor does not have exclusive powers of appointment and removal. Quite the contrary, the constitutional text and history make clear that those powers generally are divided between the Legislature and the Governor. On that score, we reaffirm that the question before us is one of State law, and Federal precedent has limited significance (see Prentis v Atlantic Coast Line Co., 211 US 210, 225 [1908] ["Whether the legislative, executive, and judicial powers of a state shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the state"]).
In support of his expansive view of gubernatorial power, plaintiff relies on a misinterpretation of the Constitution's Vesting and Take Care clauses. New York's original Vesting Clause provided "[t]hat the supreme executive power and authority of this state shall be vested in a governor" (1777 NY Const, art XVII). It now provides that "[t]he executive power shall be vested in the governor" (NY Const, art IV, § 1). The original Take Care Clause stated "[t]hat it shall be the duty of the governor . . . to take care that the laws are faithfully executed, to the best of [the governor's] ability" (1777 NY Const, art XIX). It currently states that "[t]he governor . . . shall take care that the laws are faithfully executed" (NY Const, art IV, § 3). That the Governor is now vested only with "[t]he executive power" rather than with "the supreme executive power and authority" belies plaintiff's expansive theory of executive power. As the dissent notes, this change reflects the intended diffusion of the power within the Executive Branch. However, the change is also consistent with the diffusion of appointment and removal power between the Legislative and Executive branches (see 4 Lincoln, The Constitutional History of New York at 456).
Plaintiff ignores the import of this change and instead erroneously equates our State Vesting and Take Care clauses with those found in the Federal Constitution. Indeed, plaintiff's reliance on federal caselaw to argue for an expansive executive dominance in our constitutional design ignores that, unlike the federal government, New York does not have a unitary Executive. The powers of the President of the United States derive from the Federal Constitution, under which "the 'executive Power'—all of it—is 'vested in a President,' who must "take Care that the Laws be faithfully executed.' " (Seila Law LLC v Consumer Fin. Protection Bur., 591 US 197, 203 [2020], quoting US Const art II, § 1, cl 1; id. § 3).
Apart from the text, history further demonstrates that the appointment and removal powers are shared between the two branches. In fact, our State Constitution grants the Legislature extensive power over the appointment and removal of state officers.
As early as 1776, more than a decade before the federal framers met in Philadelphia, New York's First Constitutional Convention gathered in White Plains (1 Charles Z. Lincoln, The Constitutional History of New York at 484 [1906]). The next year, the Convention adopted a document that, although similar to its federal successor in some respects, created a distinct governmental structure (see Charles C. Thach, The Creation of the Presidency 1775-1789: A Study in Constitutional History at 34-43, 52-54 [1969]; Wood, The Creation of the American Republic, 1776-1787 at 463). New York's 1777 Constitution, like its later federal analog, contained a Vesting Clause and a Take Care Clause. However, the 1777 Constitution contained no precursor to the federal Appointments Clause. That provision requires that the President appoint "principal officers" (Seila Law, 591 US at 217 n 3), while reflecting "Congress's central role in structuring the Executive Branch" (id. at 266 [Kagan, J., dissenting in part]). New York's Constitution, by contrast, gave the Governor "very little voice in either appointments or removals" of state officers (Edward S. Corwin, Tenure of Office and the Removal Power Under the Constitution, 27 Colum L Rev 353, 385 [1927]). Instead, those powers generally rested with a Council of Appointment, which comprised the Governor and four Senators (see 1777 NY Const, art XXIII; Matter of Trustees of Vil. of Saratoga Springs v Saratoga Gas, Elec. Light & Power Co., 191 NY 123, 132 [1908]; People v Foot, 19 Johns 58, 59 [Sup Ct 1821]; 1 Lincoln, The [*7]Constitutional History of New York at 611).[FN6] Thus, the executive power vested in the Governor included only limited control over appointments and removals.
In 1821, New York adopted its Second Constitution, which abolished the Council. However, the appointment and removal powers generally did not revert to the Governor. To the contrary, the 1821 Constitution created a default rule that the power to determine methods of appointing officers rested with the Legislature. Article IV, § 15 provided: "All officers heretofore elected by the people shall continue to be elected; and all other officers whose appointment is not provided for by this constitution, and all officers whose offices may be hereafter created by law, shall be elected by the people, or appointed, as may by law be directed" (1821 NY Const, art IV, § 15; see also People ex rel. Whiting v Carrique, 2 Hill 93, 104 [Sup Ct 1841] [per Bronson, J.]). Concomitantly, section 16 established a presumption that the appointing authority had power to remove, unless the Legislature said otherwise: "Where the duration of any office is not prescribed by this Constitution, it may be declared by law; and if not so declared, such office shall be held during the pleasure of the authority making the appointment" (1821 NY Const, art IV, § 16). Elsewhere, the 1821 Constitution specified that certain officers would be appointed or removed by the Governor, the Legislature, or some combination of the two (see e.g. id. §§ 2, 4, 6). Together, these reforms largely transferred power from the Council of Appointment to the Senate—not to the Governor (see 1 Lincoln, The Constitutional History of New York at 750).
This balance of power between the Legislature and the Governor persisted even amid other constitutional changes. In 1846, a new Constitution made certain executive officers—including the Secretary of State, the Comptroller, the Treasurer, and the Attorney General—elective (see 1846 NY Const, art V, §§ 1, 2). These alterations diminished legislative control without enhancing gubernatorial power. For one thing, they created a plural executive, with multiple officials accountable to a statewide public.[FN7] Moreover, they did not change the general rule of legislative control over appointment to and removal from offices about which the Constitution was silent (see 1846 NY Const, art X, § 2 [appointment power]; id. § 3 [removal power]).[FN8] Nor did that rule change in subsequent decades, much to some Governors' disappointment (see e.g. People ex rel. Gere v Whitlock, 92 NY 191, 198 [1883]; Sturgis v Spofford, 45 NY 446, 449 [1871]; People ex rel. Miller v Peck, 73 AD 89, 93 [4th Dept 1902]; People ex rel. Williams v Zucca, 36 Misc 260, 261 [Sup Ct, New York County 1901]). In 1872, Governor John T. Hoffman proposed to amend the 1846 Constitution so that the Governor would appoint the Secretary of State, the Attorney General, and the State Engineer and Surveyor (2 Lincoln, The Constitutional History of New York at 520-521). This was a "radical change" (id. at 521), meant to remake New York's Executive Branch in the model of its federal counterpart (see id. at 469). But Governor Hoffman's proposal failed to become law (see id. at 523-524; 1846 NY Const, art V, §§ 1, 2, as amended to 1880; 1894 NY Const, art V, § 1).
Nor were the Governor's powers of appointment and removal materially changed by adoption of the 1894 Constitution. Historian Charles Z. Lincoln—who had served as legal adviser to Governor Theodore Roosevelt (see 1 Lincoln, The Constitutional History of New York at iii)—explained in 1906 that "[m]any officers are beyond the governor's immediate control, for, as to them, [the governor] has no power of removal" (4 Lincoln, The Constitutional History of New York, at 456; see also id. at 456-458). Three years later, Governor Charles Evans Hughes agreed: "the Legislature with few exceptions has reserved final administrative control in making the heads of departments, to whose appointment the Senate's consent is necessary, removable only by it" (3 Public Papers of Charles Evans Hughes at 8-9 [1910]).[FN9]
Even sweeping reorganizations of the State Government preserved the Legislature's presumptive control over the power to appoint and remove state officers. In 1925, the State amended the Constitution to create the two-tiered civil-department structure still in place today. This structure consists of "subordinate . . . commission[s] within the departments," which operate "under" " 'heads of Departments' " who form "the Governor's 'Cabinet' " and are appointed by the Governor with the approval of the Senate (Matter of Cappelli v Sweeney, 167 Misc 2d 220, 226, 229 [Sup Ct 1995], affd on op below, 230 AD2d 733 [2d Dept 1996]; see generally 1894 NY Const, art V, as amended 1925). These amendments "confer[red] greater power and, concomitantly, greater accountability upon the Governor" (Cappelli, 167 Misc 2d at 232). However, they did not alter the residual "executive power" vested in the Governor. Indeed, the amended Constitution, much like its predecessors since 1821, continued to provide that "[a]ll other officers, whose election or appointment is not provided for by this Constitution, and all officers, whose offices may hereafter be created by law, shall be elected by the people, or appointed as the Legislature may direct" (1894 NY Const, art X, § 2; see also 1939 NY Const, art IX, § 8). This Court later explained that this language "mean[t] precisely what it says," that "the Constitution itself grants to the Legislature the power to prescribe the method by which officers other than those provided for by the Constitution shall be selected or chosen (Lanza v Wagner, 11 NY2d 317, 329, 330 [1962]).
In 1963, New York amended Article IX to reform the State's "home rule" scheme (see Richard Briffault, Local Government and the New York State Constitution, 1 Hofstra L & Pol'y Symp 79, 87-89 [1996]). Those amendments removed the language authorizing the Legislature to "direct" the appointment of offices "created by law." However, the new Constitution still contained a catch-all: "Except as expressly provided, nothing in [Article IX] shall restrict or impair any power of the legislature in relation to," among other things, "[m]atters other than the property, affairs or government of a local government" (NY Const, art IX, § 3[a] [3]). And as this Court had previously explained, "[t]he reservation of this power is merely another way of saying that the Legislature is unfettered as to 'matters of state concern' " (Adler v Deegan, 251 NY 467 [1929], amended, 252 NY 615 [1930], quoting City Home Rule Law, § 30). Consequently, nothing in the 1963 amendments suggested that the appointment and removal powers were suddenly and silently vested with the Governor after nearly two centuries of legislative preeminence.
We glean from this history that the executive power entrusted to the Governor through our Constitution's Vesting and Take Care Clauses does not encompass exclusive, indefeasible powers to appoint or remove non-constitutional state officers. Those clauses were never understood to confer an exclusive power on the Governor to appoint and remove executive officers. Plaintiff's contrary claim thus lacks textual and historical support.
iii.
The Act is Intended to Regain and Retain Public Confidence in Government, by Limiting Executive Self-Regulation in Public Ethics
New York's functional approach to the separation of powers requires that we consider the intent of the legislation and the realities of governing within a system of cooperative branches. These considerations establish that the Act furthers a singular purpose: regaining and retaining public confidence in government by creating an independent mechanism for ensuring that executive officials comply with the ethics and lobbying laws.
Regulation by the Governor and senior executive officials of their own ethical obligations has distinct implications for the separation of powers. Our Constitution secures government for the people through government by the people, guaranteeing a broad franchise, robust participation rights, and public officials whose power depends upon electoral approval (see e.g. NY Const, art I, §§ 1, 8, 9, 11; art II, § 1; art III, § 1; art IV, § 1; art V, § 1). The separation of powers supports this strategy, by ensuring that the public knows who exercises what authority and can readily hold them to account (cf. Jonathan L. Marshfield, America's Other Separation of Powers Tradition, 73 Duke LJ 545, 628 [2023]). For that reason, in nearly every context, New York's separation-of-powers principles do not countenance laws that insulate appointees from supervision by officials directly accountable to the public to the extraordinary degree authorized by the Act.[FN10] With respect to official ethics, however, matters are different. The ethics laws alone presume that public accountability is insufficient to ensure the government's integrity. Were it otherwise, those laws would be unnecessary. The same presumption suggests that self-regulation in public ethics is illusory—or, at least, so the Legislature might conclude. Put differently, it is only in matters of public ethics that executive officials risk truly serving as judges in their own cases, despite our law's condemnation of such a practice (see Orange County v Storm King Stone Co., 229 NY 460, 463 [1920]). So far as we can discern, similar concerns arise in no other legislative domain.
These are not merely prudential concerns, but rather implicate fundamental constitutional values. Public corruption and the misuse of power leads to public distrust in government and its officials (see Jong-Sung You, Trust and Corruption, in The Oxford Handbook of Social and Political Trust at 486 [2018] ["(T)here is very strong and robust empirical evidence of the causal effect of corruption and institutional fairness on social trust as well as institutional trust"]). As public confidence in government erodes, disaffection leads to reduced political participation and distrust of civic institutions (see Eduardo Rivera, Enrique Seira & Saumitra Jha, Democracy Corrupted: Apex Corruption and the Erosion of Democratic Values at 42-43 [May 15, 2024], available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4828243). This loss of trust is increasing, along with its attendant negative impact on public engagement (see Pew Research Center, Public Trust in Government: 1958-2024 [June 24, 2024], available at https://www.pewresearch.org/politics/2024/06/24/public-trust-in-government-1958-2024/ [finding that public trust in the federal government is near historic lows]). Experience confirms that democracy cannot thrive and [*8]institutions cannot function where the public perceives that government actors use their power to serve their personal interests rather than those of their constituents (see e.g. Rivera, Seira & Jha, Democracy Corrupted; see also Olivier Bargain & Ulugbek Aminjonov, Trust and Compliance to Public Health Policies in Times of COVID-19, 192 J Pub Econ 1, 13 [2020] ["Trust in governments is an important determinant of citizens' compliance with public health policies, especially in times of crisis"]). More pointedly as to the matter before us, the foundation of our constitutional system and our republican form of government may be jeopardized when New Yorkers no longer believe in the integrity of their government. Retaining public trust is essential for our government to function effectively and secure the freedom of its citizens, and thus is a paramount State interest (see Philip Pettit, Republican Theory and Political Trust, in Trust and Governance 295, 304 [Valerie Braithwaite & Margaret Levi, eds., 2003]). Greater flexibility in applying separation-of-powers principles is wholly—and uniquely—appropriate when adjudicating an effort to promote public confidence by limiting self-regulation of ethics and lobbying laws by government officials.
It is undisputed that the Act and the Commission structure are designed to address a serious threat to public confidence in government identified by both branches and by advocates. As such, the Act furthers "a paramount State interest" (Cohen, 94 NY2d at 12), in ensuring that executive officials comply with the ethics laws, which is essential to regaining and retaining public trust in government. Given the significant challenges posed by executive officials' self-regulation, including the risk that an individual might elevate their private interests over those of the communities they are charged to serve, the joint decision of the Governor and Legislature to create an ethics commission independent of direct political control is entitled to substantial consideration by this Court.
To be clear, the mere fact that the two branches seek to address a vital issue of public concern is insufficient basis for us to overcome the separation of powers doctrine; otherwise, the doctrine would be rendered nugatory by the simple expedient of identifying a problem and designing some governmental "fix." Here, however, the branches are not dealing with the common problems of governing by which elected officials regularly pass and enforce laws to improve New Yorkers' lives—such as, for example, the health code or sanitation rules—but rather with a means to ensure the foundational precept of a government for the people. The Act seeks to achieve that singular and paramount goal.[FN11]
C.
Applying these constitutional standards here, we conclude that the Act neither unconstitutionally encroaches upon the Executive nor otherwise deviates from constitutional requirements.
First, the Act violates no constitutional command concerning appointments. Of the Commission's eleven members, the Governor appoints three and the Executive Branch cumulatively appoints five. The six members appointed by the Legislature are spread between the controlling parties: two by the Temporary President of the Senate; one by the Minority Leader of the Senate; two by the Speaker of the Assembly; and one by the Minority Leader of the Assembly (Executive Law § 94 [3] [a]).[FN12] This structure is wholly consistent with New York's constitutional tradition that generally allows the Legislature to direct the appointment of non-constitutional officers. Moreover, plaintiff's own reasoning makes plain that not all appointees are agents of those who appointed them. Were it otherwise, further accountability mechanisms—including the removal power—might well be unnecessary to ensure that appointees carry out the commands of their "principals." Thus, plaintiff's contention that the Commission is controlled by "legislative agents" is without merit.
The same is true of his subsidiary claim that the Commission is appointed by a non-constitutional body, the IRC. The IRC does not appoint any member; it merely vets each nominee and ensures their qualifications to serve on the Commission. While the IRC may approve or deny a nominee, only a "selection member"—by law, a legislator or executive official—may appoint a member to the Commission (see Executive Law §§ 94 [2] [b]; [3] [d]). Indeed, the IRC has no power to consider, let alone appoint, someone who has not been nominated by a selection member or a person statutorily ineligible to serve on the Commission (see id. §§ 94 [3] [d], [e]). The Court has previously upheld as constitutional an arrangement where the Legislature created a "selection board" composed of eleven representatives of private universities and civic organizations to prepare a list of nominees for appointment to the New York City Board of Education, from which the City Mayor was required to choose (see Lanza, 11 NY2d at 322-323). The Court concluded that the board ensured the appointment of qualified individuals based on an "objective and nonpartisan basis" (id. at 333). Although Lanza involved a claim based upon the alleged delegation of legislative power, the animating principle applies with equal force to plaintiff's separation of powers argument against the IRC: the Constitution does not bar the Legislature from relying on experts to assist with appointments that the Legislature is free to make on its own.[FN13]
The Board of Commissioners of Pilots also offers some precedent for the Commission's structure. That entity may make, promulgate, and enforce regulations, including by seeking penalties (see Navigation L §§ 95 [1]; 97 [1]). Currently, the Governor may appoint one of its six members (see id. § 87). But for over a century until 1999, the Commissioners of Pilots were chosen exclusively by private parties (see Sturgis, 45 NY at 449; Senate Introducer's Mem, Bill Jacket L 1999, ch 258). Contrary to plaintiff's suggestion, we cannot dismiss that longstanding body as an unconstitutional anomaly (cf. Seila Law, 591 US at 220, citing Myers v United States, 272 US 52, 220 [1926]).
Second, the Act remains within constitutional bounds respecting the removal power. The Supreme Court has observed that "it is 'only the authority that can remove' [executive] officials that they 'must fear and, in the performance of [their] functions, obey' " (Seila Law, 591 US at 213-214, quoting Bowsher v Synar, 478 US 714, 726 [1986]). It is precisely because removal so forcefully commands obedience that the Legislature had sound reason to shield the Commission from it. To permit the Governor—or any other executive official—to remove Commissioners might well have been tantamount to permitting those officials to dominate the Commission and thereby to control the enforcement of the ethics laws against themselves and their political allies. This, in turn, might have engendered the very public distrust the Legislature sought to avoid. Considering the Legislature's long-held constitutional power to set the terms on which non-constitutional officials may be removed from office, we cannot conclude that it acted unlawfully in declining to grant the Governor the power to remove Commissioners.[FN14]
Third, and finally, the Legislature has not upset the careful balance among the coordinate branches (see Delgado, 39 NY3d at 264 [Wilson Ch. J., concurring]). In addition to the appointment powers discussed above, the Executive Branch has certain supervisory powers over the Commission. Primary among these is the Moreland Act, which empowers the Governor to investigate the Commission. Executive Law § 6 provides in relevant part:
"The governor is authorized at any time, either in person or by one or more persons appointed by [the governor] for the purpose, to examine and investigate [*9]the management and affairs of any department, board, bureau or commission of the state. The governor and the persons so appointed . . . are empowered to subpoena and enforce the attendance of witnesses, to administer oaths and examine witnesses under oath and to require the production of any books or papers deemed relevant or material."
This law "recognize[s] explicitly the need for and the power in the Governor to oversee, but . . . not necessarily to direct, the administration of the various entities in the executive branch" (Rapp v Carey, 44 NY2d 157, 162 [1978]). Nothing in the Ethics Commission Reform Act diminishes this power, which "has been employed by virtually every governor to investigate problems of waste, mismanagement, and corruption at all levels of state government and recommend reforms" (Bennett Gershman, Constitutionalizing Ethics, 38 Pace L Rev 40, 43-44 [2017]).[FN15]
The Governor also exerts influence through budgeting. In brief, the Governor submits a budget, exercising "certain legislative powers" vested by Article VII, §§ 1-7 of the Constitution (Pataki v New York State Assembly, 4 NY3d 75, 83 [2004]). The Legislature then reviews it, wielding only "a limited grant of authority from the People to the Legislature to alter the budget proposed by the Governor," and even then, "only in specific instances" (id. at 84 [internal quotation marks omitted]). The Act does not purport to alter this arrangement, but rather recognizes that "[t]he annual budget submitted by the governor shall . . . state the recommended appropriations" for the Commission" (Executive Law § 94 [1] [f]). The budget process is not, as the dissent colorfully describes it, a shaming exercise (see dissenting op at 19). Instead, New York's executive budgeting procedure, much like the federal congressional appropriations power, provides a "most complete and effectual weapon" against Commission overreach (Madison, Federalist No. 58).
In addition to supervising the Commission, the Executive Branch also retains concurrent enforcement authority. The Governor retains the power to discipline Executive staff (or not) even if the Commission chooses to impose fines (or not). Moreover, while responsibility for civil enforcement of the Act and the ethics and lobbying laws rests with the Commission (see Executive Law §§ 94 [10] [n] [i], [ii]; Public Officers Law §§ 73 [18]; 73-a [4]; 74 [4]), criminal enforcement remains with appropriate executive authorities (see Executive Law § 94 [10] [n] [iv]). These include the Attorney General who, upon request from the Governor, the Comptroller, or any State department head, may investigate and prosecute any alleged criminal offense (see Executive Law § 63 [3]). Even absent such request, the Attorney General may "commence civil investigations in the public interest" and may "prosecute 'all persons indicted for corrupting or attempting to corrupt any member or member-elect of the legislature, or the commissioner of general services' " (People v Gilmour, 98 NY2d 126, 131 [2002], first citing Executive Law § 63 [8] and then quoting Executive Law § 63 [4]). District Attorneys, for their part, "have plenary prosecutorial power in the counties where they are elected" (People v Romero, 91 NY2d 750, 754 [1998]; see County Law § 700 [1]). Thus, the Act grants the Commission enforcement power without wholly displacing that of the Executive [*10]Branch. This arrangement reflects the Act's intended purpose: where an Executive official or their supervisor would have a conflict in investigating or disciplining themselves, the Commission has authority to do so.
Conversely, the Commission's executive powers are limited. Although the Commission possesses the power to "implement" through monetary penalties the Legislature's "critical policy decisions" (Matter of LeadingAge N.Y., Inc. v Shah, 32 NY3d 249, 259 [2018]), that power is subject to important constraints.[FN16] First, the penalties are statutorily capped, providing a limitation on the Commission's enforcement discretion (Executive Law §§ 94 [10] [n] [i], [ii]). And second, the Act provides for judicial review in an Article 78 proceeding, which is another control on potential Commission abuse or overreach (see id. § 94 [10] [o]; CPLR 7803). Thus, we cannot agree with plaintiff either that the Commission operates without executive oversight or that the Legislature has taken the "whole power" of the Executive to expand its own (Cohen, 94 NY2d at 13). A facial separation-of-powers challenge cannot stand on the Commission's civil penalty powers alone when the Commission's structure is otherwise constitutional.
We emphasize that the Act goes very near the line of what is constitutionally permissible without crossing it. As discussed, the State has a paramount interest in promoting public trust in government by ensuring impartial enforcement of the ethics and lobbying laws and the Act furthers that goal. Critically, the substantial limitations built into the Act ensure that the Commission remains within the constitutional guardrails we herein recognize. Our decision is thus narrow and limited to the unique problem of self-regulation and enforcement of the ethics and lobbying laws.
Plaintiff has brought a facial challenge, and he has not carried the heavy burden that lies with that choice. We hold only that the Act does not, in every possible application, unconstitutionally encroach upon the powers of the Governor or the Executive Branch. We express no view as to any issues plaintiff does not raise, including the constitutionality of the Act as applied to any other person subject to the Commission's authority.
[*11]V.
Plaintiff's remaining challenges to the Act are also without merit. Under Article V, except as otherwise provided, "the heads of all . . . departments and the members of all boards and commissions . . . shall be appointed by the governor by and with the advice and consent of the senate and may be removed by the governor, in a manner to be prescribed by law" (NY Const art V, § 4). Plaintiff contends that the Commission unconstitutionally operates as a department without a "head" removable by the Governor. This argument is unpersuasive because the Commission is not a "department" in the constitutional sense. The Act expressly establishes the Commission "within the department of state" (Executive Law § 94 [1] [a]). This Court has explained—and the constitutional structure effectively requires—that an entity "within an existing government department" is not a "department" for purposes of Article V, § 4 (Matter of Metropolitan Life Ins. Co. v New York State Labor Relations Bd., 280 NY 194, 208 [1939]). This rule reflects that the 1925 constitutional amendments that produced Article V "left the question of supervision and control by the Governor an open one to a large extent, and passed that problem along to the Legislature" (8 NY Constitutional Convention Comm., Problems Relating to Executive Administration and Powers at 268 [1938]). Thus, Article V enshrines a formal principle of governmental organization, not a substantive requirement of direct gubernatorial control of every state entity.
Plaintiff's additional claim that impeachment is the only remedy for any alleged ethics violation by a Governor requires little comment. Plaintiff's argument, although somewhat undeveloped, appears to be that the Legislature may discipline a Governor only by exercising the power of impeachment vested by Article VI, section 24 of the Constitution and that the Commission's disciplinary authority permits an unconstitutional end run around this limitation.[FN17] But the Commission's power to impose a fine on the Governor does not encroach on the Legislature's exclusive impeachment power. It only constitutes an additional means of exposing and punishing corruption, which is not inherently unconstitutional. Indeed, the Attorney General can criminally or civilly prosecute a Governor without disrupting the Legislature's impeachment authority and District Attorneys can prosecute Governors for violations of ethics laws. By any measure, the power given to the Commission is far more limited than either the Attorney General's or District Attorneys' power to prosecute the Governor criminally. Thus, the mere power of the Commission to investigate and fine is permissible. Further, insofar as plaintiff takes issue with the Commission's power to recommend impeachment, that power does not encroach on the Legislature because the Legislature can always ignore the Commission's recommendation.
[*12]VI.
In conclusion, we emphasize the unique constellation of factors that lead to our holding. Under our Constitution, the Governor does not have unfettered powers of appointment and removal. Trust in government is essential to democracy because its erosion leads to apathy, disaffection, and the breakdown of civic institutions. Indeed, government cannot function if the public perceives that those entrusted with public power are unaccountable when they misuse their authority for private gain. Maintaining public confidence is thus a foundational State interest and a core governmental responsibility. Given the danger of self-regulation, the Legislature and the Governor have determined that there is an urgent need for the robust, impartial enforcement of the State's ethics and lobbying laws. That task is assigned to the Commission. Neither the Legislature nor the Executive Branch has undue influence over the Commission, a structural characteristic lawfully chosen to ensure the integrity of the Commissioners and to instill public faith in government. Finally, the Legislature has not otherwise encroached upon the exclusive constitutional purview of the Executive Branch. Plaintiff has thus failed to establish that the Act is unconstitutional on its face.
Accordingly, the order of the Appellate Division should be reversed, with costs, judgment declared in accordance with this opinion, and the certified question answered in the affirmative.

GARCIA, J. (dissenting):

The two courts below concluded that the Ethics Commission Reform Act of 2022 (the Act), which grants to the New York State Commission on Ethics and Lobbying in Government (the Commission) unprecedented responsibility for "administering, enforcing, and interpreting New York state's ethics and lobbying laws" (Executive Law § 94 [1] [a]), violates the State Constitution. The majority reaches a different conclusion, finding no separation of powers violation by relying on approbation of the Act's goals, a "flexible" application of that doctrine that effectively eliminates a structural constitutional safeguard, and a focus on isolated provisions of the legislation. This novel approach, lauding the purported good government goals of the legislation at the expense of constitutional guardrails on interbranch encroachment, finds no support in this Court's precedent. I agree with the courts below that the Act violates bedrock principles of separation of powers enshrined in our State Constitution and therefore I dissent.
I.
To describe the way in which the Commission is appointed, how it operates, who is—and who is not—subject to its enforcement power, and how its members may be removed is to fairly answer the constitutional question. By legislative design, the Commission is comprised of eleven members, a majority of whom (six) are nominated by the legislative branch and a minority (five) by the executive branch (Executive Law § 94 [3] [a]). But those "nominations" do not technically mean appointment. For that to happen, an Independent Review Committee (IRC) made up of "the American Bar Association accredited New York state law school deans or interim deans" must approve those nominations pursuant to self-devised criteria (id .§ 94 [2] [c])—including apparently whether a nominee's "lived experience allows them to understand the range of perspectives needed to effectively serve as a member of an ethics commission that has broad oversight of a large and diverse public workforce" (see State of New York Independent Review Committee, Committee Procedures Updated August 2024). Once vetted for life experience and other attributes by the law school deans and installed, members are removable only by "a majority vote of the commission" (Executive Law § 94 [4] [c]). Of course, the legislature's nominees constitute a majority of members, and a simple majority of Commission members constitutes a quorum (id. § 94 [4] [h]).
The majority, in its celebration of the good government aims of the legislation, neglects to detail the range—and limits—of these powers. The Commission's executive authority is sweeping, both to investigate violations of sections of the Public Officers Law, the Lobbying Act, and the Civil Service Law, and to impose penalties (id. § 94 [10] [a], [n]), yet at the same time restricted in scope. The Commission has the authority to investigate both public officials—statewide elected officials, executive branch employees, [*13]legislative branch members and employees, candidates for elected office, and political party chairs—and private citizens, in the form of current or former "lobbyists and clients of lobbyists"—potentially thousands of individuals (id. § 94 [1] [a]). Upon determining that a violation of the law has occurred, the Commission may impose financial penalties of up to $40,000, seek to recover the value of any benefit received from the alleged violation, and refer the matter to a respondent's employer for discipline or to law enforcement for potential criminal violations (id. §§ 94 [10] [n], [p]).[FN18]
There is one catch, one limit to that authority that goes unexamined by the majority in championing the statute's aim of addressing "the inherent disincentive" for one branch "to investigate and discipline itself" (majority op at 2). The statute prohibits the Commission from "impos[ing] penalties or discipline upon members of or candidates for member of the legislature or legislative employees" (id. § 94 [10] [p]). Investigations of these individuals are permitted, but upon finding a violation the Commission, although composed of a majority of appointments made by representatives of the legislature, may only "prepare a written report of its findings and provide a copy of that report to the legislative ethics commission" (id. § 94 [10] [p] [i]). And while reports of investigations into executive branch members and private citizens must be published on its website within twenty days of delivery to the parties (id. § 94 [10] [p] [ii]), there is no such mandate for reports of violations by legislative members or staff.
There was a time when this Court would not have hesitated to hold such a blatant encroachment on the power of another branch unconstitutional (see e.g. Rapp v Carey, 44 NY2d 157 [1978]; People v Tremaine, 252 NY 27 [1929]). Not today. Vigilance in enforcing the separation of powers doctrine is relaxed in deference to a law that, according to the majority, will increase "public confidence in government," reduce "apathy [and] disaffection," and prevent "the breakdown of civic institutions" (majority op at 2, 21-24, 34). These blessings seem unlikely to flow from today's decision.
II.

As an initial matter, I agree with the majority that in applying our separation of powers doctrine we must look to the New York State Constitution, its history, and to this Court's interpretation of both (see Robert F. Williams & Lawrence Friedman, The Law of American State Constitutions 270 [2d ed 2023] ["State constitutional separation of powers questions . . . call for a state-specific form of analysis rather than one applying a more generalized, or universalist, American-constitutional separation of powers doctrine"] (emphasis omitted)]). I do, however, reject the suggestion (majority op at 11-13) that our State's constitutional separation of powers doctrine is somehow less vital than its federal counterpart or that this Court is permitted to be less vigilant in enforcing that doctrine depending on our assessment of the merits of the alleged encroachment (see majority op at 21 ["New York's functional approach to separation of powers requires that we consider the intent of the legislation and the realities of governing within a system of cooperative branches" (emphasis added)]). The majority understandably neglects to provide any authority for such a means-ends balancing test; it has no place in this Court's separation of powers jurisprudence.
To understand the contours of a state constitution's separation of powers doctrine, we must "account for historical development and synthesize the distinct constitutional visions of several generations of constitution-makers" (G. Alan Tarr, Interpreting the Separation of Powers in State Constitutions, 59 NYU Ann Surv Am L 329, 332-333 [2003])[FN19]. In New York, those generations span more than 200 years, [*14]providing a rich and layered account of the development and strengthening of the doctrine, from our first state charter through the creation of the modern executive in the twentieth century. New York courts, like the Appellate Division and the Supreme Court in this case, have enforced separation of powers safeguards to protect that constitutional legacy.
There can be no dispute that the concept of separation of powers is deeply rooted in our State Constitution. While the doctrine finds no standalone expression in that document, it is, as we have "consistently recognized," a principle nevertheless enshrined in the structure of the Constitution and "included by implication in the pattern of government adopted by the State of New York" in every Constitution from 1777 to the present iteration (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 355-356 [1985]; see also Clark v Cuomo, 66 NY2d 185, 189 [1985] [separation of powers is "implied by the separate grants of power to each of the coordinate branches of government"]; Madison, Federalist No. 47 ["The (1777) constitution of New York contains no declaration on this subject (of separation of powers); but appears very clearly to have been framed with an eye to the danger of improperly blending the different departments"]). This Court has explained that "[t]he concept of the separation of powers is the bedrock of the system of government adopted by this State in establishing three coordinate and coequal branches of government, each charged with performing particular functions" (Matter of Maron v Silver, 14 NY3d 230, 258 [2010]; see also Matter of County of Oneida v Berle, 49 NY2d 515, 522 [1980]). While "some overlap between the three separate branches does not violate the constitutional principle of separation of powers" (Clark, 66 NY2d at 189), the doctrine is a "structural safeguard rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified" (Matter of Maron, 14 NY3d at 260-261 [internal quotation marks omitted]).
In the most basic terms, the aim of the doctrine is not merely the mechanical separation of the functions of government but the preservation of liberty. In rebuffing past attempts to erode that doctrine by casting it as an outdated "relic" that impedes, rather than protects, democracy, this Court has warned that "[t]he separation of the three branches is necessary for the preservation of liberty itself and it is fundamental of the organic law that each department should be free from interference, in the discharge of its peculiar duties, by either of the others" (Matter of Maron, 14 NY3d at 258 [emphasis added and internal citations and quotation marks omitted]; see also Under 21, 65 NY2d at 356 ["contrary to the Appellate Division's characterization of the doctrine as a 'vestigial relic,' we have recently unanimously reaffirmed its continuing vitality"]). Or, as one leading state constitutional scholar has explained, "[a]s important as the 'protection' of one branch from another is, such as the executive from the legislature, the underlying goal of the judicial enforcement of separation of powers principles is the liberty of the citizens"(Williams & Friedman at 275 [emphasis added]; see also Ellen A. Peters, Getting Away from the Federal Paradigm: Separation of Powers in State Courts, 81 Minn. L. Rev. 1543, 1564 [1997] ["It is appropriate to wonder whether unchecked governmental power anywhere, no matter how well intentioned and how expedient, can provide enduring assurance of the full protection of individual and civil rights that is basic to a democracy"]).
It is that overarching goal, the preservation of liberty, which has guided this Court in its application of our separation of powers restraints (County of Oneida, 49 NY2d at 522 ["Extended analysis is not needed to detail the dangers of upsetting the delicate balance of power existing among the three, for history teaches that [*15]a foundation of free government is imperiled when any one of the coordinate branches absorbs or interferes with another"]). We lose sight of that goal today by employing a "balancing test" that weighs this Court's assessment of the benefits of the alleged encroachment against a bedrock principle of constitutional law.
The repercussions of the majority's approach are all the more alarming given that this Court's role in enforcing the balance of power among the branches of State government is vital—and unique. "[T]he federal separation of powers doctrine, unlike the federal analysis of individual rights incorporated through the Fourteenth Amendment, provides no binding 'floor' to the distribution of powers under the state constitution" (James A. Gardner, The Positivist Revolution that Wasn't: Constitutional Universalism in the States, 4 Roger Williams U L Rev 109, 116 [1998]; see Prentis v. Atlantic Coast Line Co., 211 US 210, 225 [1908] ["We shall assume that when, as here, a state Constitution sees fit to unite legislative and judicial powers in a single hand, there is nothing to hinder, so far as the Constitution of the United States is concerned"]). Accordingly, our role "in separation of powers cases, particularly those involving encroachment, 'ought to be as vigilant arbiter of process for the purpose of protecting individuals from the dangers of arbitrary government' " (Williams & Friedman at 275, quoting Rebecca L. Brown, Separated Powers and Ordered Liberty, 249 U Pa L Rev 1513, 1565 [1991]). New York courts alone have this responsibility to the People of the State.
In addition to the lack of a federal backstop, the retention of plenary power by the legislature also counsels in favor of vigilance by this Court in enforcing the separation of powers doctrine when that branch is charged with encroaching on the authority of another. "The legislature has all the power . . . there is, except as limited by the Constitution" (People ex rel. Cent. Trust Co. v Prendergast, 202 NY 188, 197 [1911]; see also People ex rel. Wood v Draper, 15 NY 532, 543 [1857] ["(T)he people, in framing the constitution, committed to the legislature the whole law making power of the state"]). As a result, restraints on this power are found only "expressly or by necessary implication" in the language of the constitution (Silver v Pataki, 96 NY2d 532, 537 [2001]). In other words, "a state constitution serves as a charter of law and government for the state . . . provid[ing] limitations on the otherwise plenary, residual, sovereign power of states to make laws and govern themselves" (Williams & Friedman at 4). The effect of this residual plenary power of the legislature is that "[i]n determining the distribution of powers among the branches of state government, the underlying premise must be that the powers of the executive and the judicial branches are defined by the constitution, where the legislature's are not" (G. Alan Tarr, Understanding State Constitutions 16 [1998]). Defined executive power represents one of the few limits on legislative authority, an implied structural constraint the enforcement of which is a vital check on that plenary power.
Finally, the nature of the encroachment here, far from providing a reason for reduced vigilance, increases the threat and itself requires rigorous scrutiny. The legislature passed a law creating a "commission" with a majority of its own appointees, to exercise a quintessentially executive function—to enforce the law—without executive oversight, in effect a forced delegation of executive power. This form of encroachment, by which the legislature appoints members to executive boards, "constitutes a sort of 'reverse delegation'—an encroachment that should be subjected to rigorous judicial scrutiny" (Williams & Friedman at 275). Because delegation "constitutes . . . a ceding of authority" while "reverse delegation is a form of legislative encroachment on the executive," "[i]t can be argued persuasively that reverse delegation, therefore, should receive more rigorous judicial scrutiny than delegation" (id. at 276). Certainly, it should not be given less.
III.
In addition to these structural safeguards protecting the power of each branch, our constitutional history reflects the intention of the People to equip the executive with the power necessary to govern a modern state. At the same time, this enhanced power was balanced by intra-branch checks on the executive achieved by distributing certain powers to other executive officers. The majority both fails to acknowledge [*16]the development of robust executive power in New York and misunderstands the separation of powers implications of a non-unitary executive.
From the first Constitution in 1777, New York chose to "provide[] for a stronger executive than all the other states" to "keep the weaker branches (executive and judiciary) separate and independent" (Peter J. Galie, Ordered Liberty 4 [1996]; see also Tarr, Understanding State Constitutions at 87 ["The New York Constitution . . . provid(ed) a model for republican government with a substantially enhanced executive"]). At this point, however, the separation between the branches was very much a work in progress—for example, the Constitution "blend[ed] the executive and judiciary departments" by establishing a Council of Appointment (Madison, Federalist No. 47 [describing instances of state constitutions that "violated the (separation of powers) rule established by themselves" because "the appointment to offices, particularly executive offices, is in its nature an executive function," and using as an example New York, where "members of the legislative are associated with the executive authority, in the appointment of officers"]; see 1777 NY Const art XXIII).
Those defects were addressed in the 1821 Constitution, which eliminated the Council of Appointment as well as the Council of Revision, a committee made up of the governor, state chancellor, and members of the judiciary empowered to revise and veto all proposed legislation (see 1 Charles Z. Lincoln, The Constitutional History of New York 611 [1906]; James T. Barry III, The Council of Revision and the Limits of Judicial Power, 56 U Chi L Rev 235, 245[1989]). Described as "flagrant violations of the strict doctrine of separation of powers," these entities were removed as part of an attempt to "realign[] the constitutional structure with notions of separation of powers and checks and balances" (Ordered Liberty at 89). In place of the Council of Revision, the governor was given veto power (id. at 81; see 1821 NY Const, art I, § 12). Debate about "substitute plans" for appointment power occupied the convention, and "[t]he practical result of the change was the enlargement of the council from four to thirty-two members, and vesting in the governor the exclusive right of nomination" (1 Lincoln at 750 [the "thirty-two members" represented the size of the State Senate, the body charged with confirming the Governor's nominations]; see also Jabez D. Hammond, The History of Political Parties in the State of New York 69-71 [1842] [The delegates were unanimous in the decision to "vest( ) (appointment power) in the governor and the senate" and came "to the determination to place the general appointing power in the governor, by and with the advice and consent of the senate"]). The 1821 Constitution thus "firmly fixed in the Constitution" "the nominating power of the governor" (1 Lincoln at 750). The majority's statement that the abolition of the Council "transferred power from the Council of Appointment to the Senate—not to the Governor" is incorrect (majority op at 17).
Also added in 1821 was a "Take Care" clause, identical to the federal counterpart (id.), which "provide[s] the governor with the power to supervise and control the executive branch" (Peter J. Galie & Christopher Bopst, The New York State Constitution 142 [2d ed 2012]; see 1821 NY Const, art III, § 4)[FN20]. Building on the work done in 1821, constitutional amendments passed in 1846 placed "many restrictions on legislative power" and ceased to identify "the legislative will . . . with the people's will" (Ordered Liberty at 105 ["Taken as a whole, the reduction of legislative power was a most striking aspect of the work of the 1846 convention"]). This power, removed from the legislature, was transferred "from the government directly to the people, diminishing the power of all three branches" (id. at 111).
The increasing power of the executive is most strikingly evidenced by the proposals made at the 1915 convention, which included an attempt at placing "centralized authority in the hands of a single executive" (Ordered Liberty at 200). While the proposed constitution was rejected by voters, a majority of the changes [*17]recommended in 1915 ultimately passed through the amendment process (see id. at 201). As described in a leading treatise of New York State Constitutional history, "[t]he major developments in the constitutional powers of the [executive] office took place during the first half of the twentieth century and include a four-year term (1937), the executive budget (1927) and the executive reorganization and greater appointment powers (1925)" (Galie & Bopst at 137; see also Tremaine, 252 NY at 45 [in considering an allegation of legislative overreach in the budget process, the Court concluded that "(t)he provision for the budget system is a new and complete article of the Constitution," and in light of the executive branch's budgetary authority, the conferral of "powers on the legislative chairmen . . . is unconstitutional and void"]). With these revisions, the power of the executive was made commensurate with the evolving challenges of governing a modern state:
"The focus inevitably shifted to the executive branch. An effective executive, one in control of his [or her] own . . . budget, was identified with a responsible executive able to make government work to meet the needs of the people. It was an easy step to the conclusion that a more effective and responsible executive meant a more democratic government. One hundred and fifty years after the adoption of the first constitution, the branch of government most identified at the founding with tyranny came to be seen as the branch most likely to provide democratic responsiveness" (Galie & Bopst at 31).
By the mid-1920s, changes to article V reinforced the effectiveness of the executive. These amendments "complete[d] the [executive] branch by providing the ground rules for the organization of the civil departments" (Galie & Bopst at 151). Section 4, which provides for the only two department heads not appointed by the Governor because of a decision to ensure the independence of those departments, "confirms the governor's power to appoint and remove heads of civil departments, which along with the executive budget, constitutes the basis of the governor's power to supervise and control the executive branch" (Galie & Bopst at 156). As one historian summed up, after the passage of these amendments, "[t]he Governor of the State of New York possessed at last the power the Governor had always been intended to possess" (Robert A. Caro, The Power Broker 260 [1975]).
Ignoring this record of increasing executive power, done in careful increments over the course of 250 years, the majority instead selects somewhat puzzling features for its own analysis. For example, the majority places great weight on the change in phrasing from the 1777 Vesting Clause's reference to "the supreme executive power and authority" to the current description of "executive power" (majority op at 14-15 [this change in language "belies plaintiff's expansive theory of executive power"]). This reliance on a title change that took place in 1821 when the substantive powers of the executive were being enhanced and protected from encroachment is misplaced, as is the majority's unsupported conclusion that this "change is also consistent with the diffusion of appointment and removal power between the Legislative and Executive branches" (majority op at 15), a conclusion firmly rebutted by the history of executive power in New York.[FN21]
Reliance on this title change reflects a more fundamental flaw in the majority's analysis. In fact, the change in phrasing has been explained not as a reduction in executive power in favor of the legislative branch, but as "leaving room for the application of other elements of executive authority by means of other officers who were . . . vested with large executive powers" (4 Lincoln at 456 [1906]). That is, contrary to the majority's assessment (majority op at 14-15), a fractured executive does not result in more power given to the legislature or otherwise diminish the executive branch's power as a whole. Instead, the dispersal of gubernatorial power was instituted as executive branch power increased; with that enhanced role came concern that a too powerful individual executive may pose a threat to liberty. Accordingly, the answer was the imposition of "intra-branch" separation of powers (see e.g. Robert A. Schapiro, Contingency and [*18]Universalism in State Separation of Powers Discourse, 4 Roger Williams Univ L Rev 79, 102 [1998] [compared with the federal government and its unitary executive, "(e)xecutive branches of state governments often have a more diffused assignment of authority . . . , affording independence to other executive officers in addition to the governor . . . (to) act as an internal check on the state executive power"]; see also 81 Misc 3d at 251 ["rival executive officers() scrapping over their domains has nothing to do with this case"]). The majority's focus on the creation of "a plural executive, with multiple officials accountable to a statewide public" (majority op at 18), speaks not to a diminishment of executive power but to an intra-branch dispersal of power.
IV.
The majority ignores, or in the case of the non-unitary executive misinterprets, the relevant history representing distinct lines of power drawn by the People of this State, and in doing so diminishes this Court's important role in preserving that separation. Instead, the majority relies on three factors that "compel" the conclusion that the law is constitutional: (1) a general "flexible" or "commonsense" approach to the separation of powers doctrine; (2) the fractured nature of executive power in New York and the fact that the Governor does not have the sole and unlimited powers of appointment and removal; and (3) a sense that "the integrity of our constitutional design depends on the public's trust in government" and its view that the act accomplishes this goal (majority op at 11). This novel approach finds no support in our caselaw and sets a new, and dangerous, precedent for evasion of separation of powers constraints.
To take the last factor first, this Court has never recognized an exception to the separation of powers restraints based on legislative intent. To the contrary, we have explained that, when considering the constitutionality of a statute, "[w]e are not concerned with the policy or expediency of the legislation," and "statutes which are beyond the power of the Legislature are invalid, though they may be politically wise" (Village of Kenmore v Erie County, 252 NY 437, 441 [1930]); see also Rapp, 44 NY2d at 160 [in analyzing whether a separation of powers violation has occurred, noting that "(n)ot at issue is the wisdom of" the challenged executive action]; People ex rel. Wood, 15 NY at 546 ["(T)he business of the courts is with the text of the fundamental law as they find it. They have no political maxims and no line of policy to further or to advance"]). The majority substitutes an "ends justifies the encroachment" approach for that policy-neutral analysis (see majority op at 25 n 11 ["[O]ur point is that the precise requirements of the separation of powers vary with the constitutional ends at stake"]).
This is perhaps the deepest flaw in the majority's reasoning: heavy reliance on the purpose of the statute, which it promotes as "intended to regain . . . public confidence in government" as a remedy for a prior statute which the majority concludes was ineffective (majority op at 3-5, 21-25). In other words, we accept encroachment because it is the only way to accomplish the goal of "regaining and retaining public trust as a means to ensure the legitimacy of government" (majority op at 21-25). This is simply wrong as a matter of constitutional process. Moreover, the "last best hope" rhetoric is based on a false premise, namely that the only way to achieve this goal is an unconstitutional arrogation of executive power. Instead of a choice between allowing the threat to democracy that self-policing of the apparently rampant corruption in the executive branch poses (majority op at 21-25) or adherence to constitutional separation of powers constraints, the legislature could have opted to put to the People for a vote a constitutional amendment enacting the Commission. Indeed, this was the path taken to create the commission that imposes discipline on the judicial branch (NY Const, art VI, § 22), and members of the legislature attempted to begin the process of passing a constitutional amendment to enact an ethics agency to enforce ethics and lobbying laws in 2021 (2019 NY Senate Bill S855 [concurrent resolution proposing "that the constitution be amended by adding a new article V-A; in relation to state government integrity"]). Such an approach would have given voters the opportunity to approve—or disapprove—of a Commission that removes such substantial power from the executive. And, if the legislature chose to, it could have put to the People the question of placing itself beyond the reach of that Commission. But the legislature, as the sole gatekeeper of the amendment [*19]process (see NY Const, art XIX; Jerald A. Sharum, Note, A Brief History of the Mechanisms of Constitutional Change in New York and the Future Prospects for the Adoption of the Initiative Power, 70 Albany L Rev 1055, 1080 [2007]), chose not to do so. And this choice, in the majority's view, instills confidence in our democracy.
The majority also errs by focusing solely on the appointment and removal process without accounting for the full range of powers bestowed on the Commission. While perhaps the executive appointment or removal power may individually and in certain circumstances be constrained, removing both with respect to a Commission that also has the power to enforce the law has never been condoned by this Court. We have cautioned that each of these features is vital in its way to the exercise of executive power; more so in combination.
The majority assures us that in any event, the statute permits the Governor to maintain meaningful control over the Commission. First, the majority posits that statutory caps on the financial penalties the Commission may impose "provid[e] a limitation on the Commission's enforcement discretion" (majority op at 31). To an individual penalized with a $40,000 fine, a significant amount of money to most, this is cold comfort. Exemption from rigorous scrutiny, or indeed any level of scrutiny, based on our own assessment of the severity of the penalties a commission may impose is unprecedented [FN22]. Of course, once this Court determines that the statute is constitutional, the financial cap could always be increased—perhaps prompting a subsequent "how much is too much" constitutional challenge.[FN23]
Next, the majority notes that the governor's budgeting powers remain, and thus serve as a limit on the Commission's power. The statute of course does not "alter [the] arrangement" pursuant to which the Governor submits a budget that the legislature has limited power to change (majority op at 29)—what it does instead is arguably more troubling. It requires the Governor to specifically and separately "state the recommended appropriations" for the Commission, requiring separate and public disclosure of any attempt to reduce the Commission's budget (see Executive Law § 94 [1] [f]). What is the purpose of this specific provision in the Act if the general executive control over budgeting were enough to constitute "control" over the Commission? This provision is aimed at shaming, not empowering, the Governor. That the only way the Governor can exercise power over the Commission is to openly starve it of its funding demonstrates how far beyond her control the Commission operates.
The majority also takes comfort in the fact that the "Governor retains the power to discipline Executive staff (or not) even if the Commission chooses to impose fines (or not)" (majority op at 30). It is unclear how the retention of any such power mitigates the grant of that same power to a body outside the executive branch. Granting this Commission "parallel power" does not cure the unlawful delegation of executive authority.
In its effort to save the statute, the majority goes so far as to pre-approve an investigation under the Moreland Act of the workings of the Commission (see majority op at 28-29). Executive authority under the Moreland Act to investigate within the legislative sphere has been subject to dispute since its enactment in 1907 (see Ernst Henry Breuer, Moreland Act Investigations in New York: 1907-65 at 2-7 [1965]; see also [*20]Richard J. Meislin, Cuomo Pledges $5 Million Budget in Announcing Corruption Panel, NY Times, Jan 16, 1987, available at https://www.nytimes.com/1987/01/16/nyregion/cuomo-pledges-5-million-budget-in-announcing-corruption-panel.html] [last accessed Feb 7, 2025] [Governor Mario Cuomo acknowledging that the Feerick Commission's "powers to investigate practices in the Legislature would be limited by legal separations between the branches of government"]). Certainly, the issue might arise again should a future governor decide to investigate the "independent" committee stocked with legislative nominees empowered (to some extent) to investigate the legislature. Perhaps the majority's advisory opinion on the scope of executive power under the Moreland Act is an admission that today's decision indeed ushers in a post-separation of powers inter-branch free-for-all.
As a third pillar of support, the majority leans heavily on the elasticity and "flexibility" of the separation of powers doctrine, selectively citing to Chief Judge Cardozo's statement that "[t]he exigencies of government have made it necessary to relax a mere doctrinaire adherence to a principle so flexible and practical, so largely a matter of sensible approximation, as that of the separation of powers" (see Matter of Richardson, 247 NY 401, 410 [1928]; majority op at 13). As the very next sentence of Richardson makes clear, however, for that Court, if not for the majority here, flexibility had its breaking point: "Elasticity has not meant that what is of the essence of the judicial function may be destroyed by turning the power to decide into a pallid opportunity to consult and recommend" (id.). Richardson is but one example of this Court rejecting attempts to substitute "academic debate" over "flexibility" in favor of vigilance in striking down blatant separation of powers violations (see County of Oneida, 49 NY2d at 523 ["A failure (by the executive) to fulfill th(e) obligation (to carry out the laws of the State) violates the unequivocal command of the Constitution—it is not subject to academic debate concerning the proper division of governmental powers"]). As in Richardson, the statute here passes the breaking point.
V.
Instead of the majority's piecemeal approach, we must consider the overall effect of the statute, that is, whether the power granted to the Commission and the way that power is exercised results in an unconstitutional encroachment on executive authority (see e.g. Matter of NYC C.L.A.S.H. Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 180 [2016] [all factors of the challenged action should be "taken together" in assessing whether agency rulemaking violated separation of powers by encroaching on the province of the legislature (internal quotation marks omitted)]; see John Devlin, Toward a State Constitutional Analysis of Allocation of Powers: Legislators and Legislative Appointees Performing Administrative Functions, 66 Temp L Rev 1205, 1248 [1993] [recommending an analytical approach to the question of whether legislative appointment power over administrative agencies violates separation of powers principles by focusing "instead on the particular circumstances of each case and the real possibility of interference with the goals served by separation of powers if legislative appointees were permitted to exercise those particular functions, regardless of how those functions might be conceptually classified"]; Charles Herman Winfree, State ex rel Martin v Melott: The Separation of Powers and the Power to Appoint, 66 N C L Rev 1109, 1118-1119 [1988] [criticizing focus on "the appointments provision, divorced from the separation of powers provision," in reviewing separation of powers challenges]). The Act fails this test.
The Act gives the legislature the majority of appointments and a majority is a quorum, meaning that the Commission can act by vote of only legislative appointees. But retention of some degree of appointment power in the executive is an obvious and necessary check on the balance of powers (see e.g. Devlin, 66 Temp L Rev at 1245-1246 [separation of powers concerns arise "if the legislature purports to reserve . . . appointment authority for itself or its leadership," because "(e)ven if such an exercise of appointment authority by the legislative branch survives scrutiny under the appointments or vesting clauses of a state constitution, it may still fall afoul of more general distribution of powers concerns"]). Once appointed, members are only removable by a majority—which, again, may occur by vote of only legislative appointees. But we long ago explained that "[i]n this country the power of removal is an executive power and in this state [*21]it has been vested in the governor by the people" (Matter of Guden, 171 NY 529, 532 [1902]; [FN24] but see majority op at 14, 27 [despite acknowledging the "limited significance" of federal precedent, relying on one federal case to support its statement that "the Act remains within constitutional bounds respecting the removal power"]). Both the appointment and removal power are placed beyond executive control (see e.g. Devlin, 66 Temp L Rev at 1210 n 16 ["(A)ny attempt to exercise indirect control over the administration of laws through appointment of administrators may violate basic allocation of powers principles by impermissibly joining lawmaking and law-applying power or by infringing on the ability of the executive branch to carry out its constitutionally assigned duties"]).
The Commission, composed in this way, is empowered to enforce the law. But our constitutional structure provides that "the Legislature makes laws and the Executive enforces them when made and each is, in the main, supreme within its own field of action" (Tremaine, 252 NY at 39; see also Rapp, 44 NY2d at 163 ["(I)n this State the executive has the power to enforce legislation and is accorded great flexibility in determining the methods of enforcement"]). Instead the Act permits the Commission to undertake investigations, issue subpoenas, hold hearings, impose penalties, and demand forfeiture—all the ways in which a member of the executive branch would typically go about enforcing the laws (see County of Oneida, 49 NY2d at 523 ["(I)t cannot be denied that a principal function of the executive is to carry out the laws of the State"]; 4 Lincoln at 471 [The Take Care clause "gives the governor general supervision of all officers, state or local, who may have any part in the administration of the law"])[FN25]. Particularly troubling is that the enforcement power delegated to the Commission is the power to enforce the State's ethics and lobbying laws. The power of an outside body to discipline the executive branch is potentially the power to influence the actions of that branch—which may be why the legislature placed itself beyond the Commission's reach. On the other hand, the Commission's enforcement mandate reaches lobbyists and their clients, giving it unprecedented authority to penalize private citizens.
At this point, given the combination of constitutional infirmities already identified, the requirement of IRC approval of nominees is mere piling on. But discount this oddity the majority must, relying on Lanza v Wagner and Sturgis v Spofford (majority op at 26-27). Of course, the nature of the executive action in Sturgis—the licensing of New York harbor pilots—makes it a poor comparator (45 NY 446 [1871]). And the selection board in Lanza operated in reverse—the selection board provided names to the mayor, who then made the ultimate appointments from that list (11 NY2d 317, 332 [1962]). Indeed, in Lanza this Court explained that its "decision in the present case does not require us to decide whether the Legislature could have validly conferred on the selection panel the power of ultimate appointment," as the selection board "merely serves the purpose of providing by statutory sanction expert advice of unusual quality for the aid of the appointing power" (id. at 332 [internal quotation marks omitted]). Today, the majority decides that the reverse—diminishing the executive authority with a selection board of private citizens and giving to that board the ultimate appointment power [FN26]—passes constitutional muster (see majority op at 26-27).
This case is not Bourquin v Cuomo (85 NY2d 781 [1995] [creation of a Citizens Utility Board by Executive Order]) or Cohen v State of New York (94 NY2d 1 [1999] [applying presumption that legislators "act only in accordance with the fulfillment of their oaths of office" in challenge by certain legislators to law that restricted their own pay if appropriations submitted by the Governor were not acted upon in a timely [*22]manner]) (see majority op at 2, 10-13, 24, 31) but Richardson: the Act takes from the Governor what is "of the essence" of the executive function—the power to enforce the law—and "turn[s it] . . . into a pallid opportunity" for doing so through minority representation on a Commission controlled by legislative appointees (Richardson, 247 NY at 410). This encroachment demands the same response given in Richardson, but the unwavering commitment to separation of powers protections expressed by Chief Judge Cardozo is absent from today's decision.
VI.
After delineating all of the reasons that the Act is comfortably within constitutional limits, the majority "emphasize[s]"—suddenly—that "the Act goes very near the line of what is constitutionally permissible without crossing it" (majority op at 32). This inkling that something is terribly wrong is fleeting. What we come away with instead is the conviction that the majority is taken in by the form assumed by this legislation. It may have some rough features, the majority concedes, yet it means well. But a separation of powers issue will often come before a court as a wolf "clad, so to speak, in sheep's clothing" (Morrison v Olson, 487 US 654, 699 [1988, Scalia, J., dissenting]). Wide-eyed, the majority closely examines individual parts of the statute before us—the appointment power, the removal power, the IRC—and pronounces each, in turn, not wolf. But step back—it's not grandma; it's a wolf.
Order reversed, with costs, judgment declared in accordance with the opinion herein and certified question answered in the affirmative. Opinion by Judge Rivera. Chief Judge Wilson and Judges Troutman and Halligan concur. Judge Garcia dissents and votes to affirm in an opinion, in which Judges Singas and Scarpulla concur. Judge Cannataro took no part.
Decided February 18, 2025

Footnotes

Footnote 1: See Jacob Gershman, At Deadline, Ethics Unit Is in Limbo, Wall St J, Dec. 12, 2011, § A at 21 ("[The Governor] hailed the creation of the joint commission as a historic effort to end 'the dysfunction and corruption that has plagued Albany' "); see e.g. Michael Cooper, Hevesi Pleads Guilty to a Felony and Resigns, NY Times, Dec. 23, 2006, § B at 1.

Footnote 2: The original terms were staggered (see Executive Law § 94 [4] [a]).

Footnote 3: There are currently fifteen such law schools in New York.

Footnote 4: A severability issue has been briefed at Supreme Court, but judicial action is stayed pending resolution of this appeal.
Footnote 5: The dissent relies pervasively upon scholarly publications concerning state constitutions (see e.g. dissenting op at 7, quoting Robert F. Williams & Lawrence Friedman, The Law of American State Constitutions 275 [2d ed 2023]; dissenting op at 9, quoting G. Alan Tarr, Understanding State Constitutions 16 [1998]; dissenting op at 22, quoting John Devlin, Toward a State Constitutional Analysis of Allocation of Powers: Legislators and Legislative Appointees Performing Administrative Functions, 66 Temp L Rev 1205, 1248 [1993]). Such publications, although helpful, cannot substitute as sources of law for the text of our Constitution or the holdings and analyses of this Court. Contrary to the dissent, our caselaw makes clear that in New York, the separation of powers is functional and flexible rather than formalistic and rigid.

Footnote 6: Following some dispute, the Constitution, as adopted, clarified that the power to nominate prospective officers rested concurrently with each of the Council's members, including the Governor (see 1777 NY Const, art XXIII, as amended 1801; 1 Lincoln, The Constitutional History of New York at 596-612). In so doing, the State rejected a proposal to give the Governor the exclusive power of nomination (see 1 Lincoln, The Constitutional History of New York at 610).

Footnote 7: The dissent argues that the creation of a plural executive is irrelevant to this appeal (see dissenting op at 15-16). But plaintiff argues that the Act unconstitutionally limits the Governor's appointment and removal powers. It is to this point that the fracturing of power within the Executive Branch is pertinent. We elsewhere consider—and reject—plaintiff's suggestion that the Act unconstitutionally encroaches upon the broader power of the Executive Branch.

Footnote 8: At the same time, the 1846 Constitution omitted § 15 of the 1821 Constitution. Whatever effect that may have had on the Legislature's power to appoint officers, there is no indication that the 1846 Constitution was understood to confer upon the Governor an exclusive power to appoint and remove officers.

Footnote 9: This Court's language in Matter of Guden, upon which plaintiff and the dissent rely (see dissenting op at 22-23 & n 7), does not require a different reading of this history. There, the Court stated that "the power of removal is an executive power, and in this state it has been vested in the governor" (Matter of Guden, 171 NY 529, 531 [1902]). That statement, however, is narrower than plaintiff claims. Guden concerned only the power to remove a sheriff (see id.) Since 1821, the New York Constitution had vested that power explicitly with the Governor (see id.; 1894 NY Const, art X, § 1; Reports of the Proceedings and Debates of the Convention of 1821, at 389-391 [1821]). Guden thus addressed removal of an officer as to whom the Constitution was clear, not silent. Similar is this Court's reference to "the removal of a public officer" as "an executive act" (Richardson, 247 NY at 410, citing Guden). In Richardson, the Court considered the conduct of a "justice of the Supreme Court" who had been "made the delegate of the Governor in aid of the removal of a public officer" by statute (id.). The dissent ignores this plain distinction that the Legislature—not the Constitution—made the removal at issue an executive act.

Footnote 10: Even though liberty is not the only purpose against which our application of the doctrine should be measured (see supra at 12-13, citing Dreyer, 187 US at 84), we disagree with the dissent's implication that flexibility in the separation of powers necessarily comes at liberty's expense. There is good reason to think—and the Legislature was entitled to conclude—that robust, independent enforcement of the ethics laws against public officials promotes individual liberty.

Footnote 11: The dissent misunderstands our discussion of the statutory purpose (see dissenting op at 16-17). Our point is not that the Act is good policy; on that, we express no view. Rather, our point is that the precise requirements of the separation of powers vary with the constitutional ends at stake, even as the doctrine's basic contours remain fixed (see Bourquin, 85 NY2d at 785; Matter of Richardson, 247 NY at 410) To conclude otherwise would be to impose the very rigidity that our precedent has consistently rejected.

Footnote 12: The dissent ignores that this arrangement minimizes the risk of unified legislative control of the Commission.

Footnote 13: The dissent's analysis of this issue contradicts itself. Either the IRC has "the ultimate appointment power" and private citizens dominate the process (dissenting op at 25) or "the legislature appoints members to executive boards" and thereby encroaches upon the Executive Branch (dissenting op at 10). It cannot be both; indeed, it is neither.

Footnote 14: Nor is the Act's insulation of the Commission's members from removal by the Legislature fatal. Allowing the Legislature to wield removal power might have allowed it to assert undue influence on the Commission, which might itself have raised separation of powers concerns.

Footnote 15: The dissent observes that "[e]xecutive authority under the Moreland Act to investigate within the legislative sphere" is disputed (dissenting op at 20). Unlike the dissent, however, we do not view the Commission as an extension of the Legislature (see supra at 25-26). Thus, we view that dispute as immaterial. In any event, what the dissent characterizes as an "advisory opinion" (dissenting op at 20) in fact reflects only our Court's "principle of party presentation" (Paramount Pictures Corp. v Allianz Risk Transfer AG, 31 NY3d 64, 82 [2018] [Rivera, J., concurring]). Defendant represented that the Governor retained the authority under the Moreland Act to investigate the Commission; plaintiff did not dispute that representation. Aside from rejecting the dissent's characterization of the Commission, we express no view as to any potential future investigation.

Footnote 16: The dissent contends that the limitations placed on the Commission's ability to impose fines or discipline people within the Legislative Branch is part of the reason that the Act constitutes "a blatant encroachment on the power of another branch" (dissenting op at 4). The Legislature is indeed generally entitled to "discipline its own work and power" as it sees fit (Cohen, 94 NY2d at 14). However, its determination not to extend the full force of the Act's supplemental enforcement authority to legislative members, candidates, and employees creates no facial constitutional defect. By prohibiting the Commission from "impos[ing] penalties or discipline upon" such persons (Executive Law at § 94 [10] [p]), the Act neither enlarges the power of the Legislative Branch nor diminishes that of the Executive Branch. Moreover, members of the Legislative Branch remain subject to enforcement actions by the Attorney General or the District Attorneys. Thus, the Executive Branch retains ample authority to secure the Legislative Branch's rigorous adherence to the ethics and lobbying laws.

Footnote 17: We understand plaintiff to argue that only the Legislature may punish the Governor and only by impeachment, and that because the Legislature did not exercise that power during plaintiff's gubernatorial tenure, the Commission cannot lawfully investigate and discipline him now without encroaching upon the Legislature's exclusive authority. That claim is meritless for the reasons we discuss. Plaintiff does not raise, and we do not consider, whether the impeachment power may be exercised against a former Governor.

Footnote 18: On this point, the Attorney General conceded at oral argument that the statute is ambiguous as to the effect of such a disciplinary "referral." The Act provides that, for statewide elected officials the Commission may recommend only impeachment and "may not order" suspension or termination (Executive Law § 94 [10] [p] [ii] [emphasis added]), implying that for all other respondents, the Commission's recommendation as to discipline must be followed.

Footnote 19: The majority complains that this dissent relies "pervasively" on "scholarly publications" related to issues of state constitutional interpretation and separation of powers doctrine in a case involving state constitutional interpretation and a separation of powers challenge (see majority op at 13 n 5; see e.g. Robert F. Williams & Lawrence Friedman, The Law of American State Constitutions 270 [2d ed 2023]; G. Alan Tarr, Understanding State Constitutions; John Devlin, Toward a State Constitutional Analysis of Allocation of Powers: Legislators and Legislative Appointees Performing Administrative Functions, 66 Temp L Rev 1205, 1248 [1993]; but see majority op at 15, 16, 22-24 [citing, for example, Democracy Corrupted: Apex Corruption and the Erosion of Democratic Values, Stanford University Graduate School of Business Research Paper No. 4166 and Trust and Compliance to Public Health Policies in Times of COVID-19 from the Journal of Public Economics]).

Footnote 20: The majority implies the existence of a meaningful difference between the State and Federal Take Care clauses, without articulating any basis for that conclusion (see majority op at 15). As discussed further below, the important distinction between the Federal and State Constitutions relevant to this clause—that is, the state's fractured executive power—does not bear on the inter-branch encroachment of executive power but instead concerns the apportionment of the exercise of power within that branch. 

Footnote 21: It is unclear how the 1821 change in title could reflect the "diffusion of appointment and removal power" when, as even the majority recounts, the executive possessed "only limited control over appointments and removals" prior to that time (majority op at 16) and the 1821 constitution enhanced that executive authority.

Footnote 22: The Kansas Supreme Court, in upholding that state's Governmental Ethics Commission against a challenge that the legislature had improperly usurped executive power, considered as the first of four relevant factors in assessing whether the separation of powers doctrine had been violated that "[n]otably absent is any means for the Commission to enforce compliance with the act or penalize violators thereof," and instead the Commission "only investigates and reports to those who have authority to penalize or enforce" (Parcell v State, 228 Kan 794, 797, 620 P2d 834, 836 [1980]).
Footnote 23: In addition, the majority fails to consider the statute's clawback provision, which may represent a much larger dollar amount—as it does here (see Executive Law § 94 [10] [n]).
Footnote 24: The majority rejects this language because the holding in Guden concerned removal power expressly vested in the Governor (majority op at 19 n 9). But the Court's statement with respect to removal power appears in a discussion of the State's separation of powers principles and well before the specific language of the provision was analyzed (171 NY2d at 531). That the holding was "narrower" than the statement does not call into question the legitimacy of the principle, namely a settled understanding of the removal power as executive (majority op at 19 n 9).

Footnote 25: From this same material, the majority quotes that "[m]any officers are beyond the governor's immediate control, for, as to them, [the governor] has no power of removal" (majority op at 19). Yet again, the majority mistakes power dispersed within the executive branch for power removed from that branch.

Footnote 26: The dissent highlights two independent problems with the Commission—that the legislature has a greater number of nominees and that unelected individuals from non-profit organizations possess approval power over those nominees (majority op at 27 n 13).