OPINION OF THE COURT
Levine, J.
Petitioner-appellant Elizabeth Holtzman, former Comptroller of the City of New York, challenges a determination of the New York City Conflicts of Interest Board (Board) that she violated the New York City Charter’s conflicts of interest provisions. The following facts, as found by the Board, are supported by evidence in the record.
In 1992, while serving as Comptroller, petitioner also was seeking the Democratic Party’s nomination for election to the United States Senate. When it became apparent that she likely would lose the September primary contest for that nomination unless her campaign garnered significant momentum, her campaign committee obtained a $450,000 unsecured loan from Fleet Bank, a subsidiary of Fleet Financial Group, Inc. and affiliate to Fleet Securities, Inc., to finance a last minute media promotion. Petitioner was required to guarantee the loan personally, which was to be repaid by September 30, 1992 from the proceeds of a September 9 fund raising event.
Contemporaneous with these events, Fleet Securities was engaged in public finance underwriting for the City of New York and was seeking to increase those business dealings. As Comptroller, it was petitioner’s responsibility, inter alia, to work with the Mayor in selecting a management team to underwrite the City’s bonds and notes. Both prior to and after petitioner obtained the loan from Fleet Bank, Fleet Securities had made overtures to the Comptroller’s office concerning Fleet’s desire to secure a position as a manager of the City’s municipal bond offerings and pension funds. Petitioner personally attended a campaign breakfast meeting for herself on June 12, 1992 at which Fleet Securities unambiguously voiced its interest in a comanager position for the City’s securities sales.
Petitioner’s media campaign was unsuccessful, and ultimately she lost the Senate Democratic primary to Robert Abrams. In addition, after the September 9 fund raiser failed to meet her committee’s expectations, petitioner’s Fleet Bank loan went into default. At a December 15, 1992 meeting with *493 petitioner, Fleet aggressively pressured for repayment of the loan, informing her that it was considering acting upon her personal guarantee. Nonetheless, the loan was extended until February 1, 1993 and petitioner and the bank’s officers agreed to meet again in January to discuss a repayment schedule.
On December 22, 1992, the Comptroller’s office issued a Request for Proposals (RFP) for selection of a new management team to underwrite the City’s general obligations and Water Authority bonds, and Fleet Securities responded. Although petitioner designated another Comptroller staff member directly to oversee the RFP process, she did not recuse herself from participation in the selection or disclose her debtor/ creditor relationship with the bank to others in her office. When members of the campaign committee informed the senior assistant comptroller (and petitioner’s former campaign manager), Edward O’Malley, that they planned on meeting with Fleet Bank in January to discuss repayment of the loan, Mr. O’Malley informed them that because Fleet Bank had responded to the RFP, the committee could not do so. Specifically, Mr. O’Malley advised that, due to petitioner’s general policy of imposing a “quiet period” during which her staff or representatives would have no communications with underwriting firms that had responded to an RFP to avoid the appearance of bias or preferential treatment, any such meeting with Fleet would have to be postponed until the management team was chosen.
Consequently, Fleet Bank was informed by the campaign committee that it could not communicate with petitioner regarding the loan during the quiet period. Moreover, despite plans to meet with the bank in January, and her awareness that her loan would once again go into default on February 1, 1993, petitioner made no attempt to contact Fleet Bank during this time. By letter dated February 12, 1993, with a copy to petitioner, Fleet Bank informed the campaign committee that the loan was being transferred to the bank’s Managed Assets Department due to the inability to negotiate a restructure of the loan, specifically and expressly as a result of the imposition of the quiet period.
On recommendation from petitioner’s office, on March 17, 1993, Fleet Securities was awarded a comanager position by the City. Petitioner personally signed a public “Tombstone” notice on April 1, 1993, which listed Fleet Securities as a comanager. Fleet’s qualifications for that position are not in dispute. *494 Soon thereafter, press coverage of petitioner’s debtor status with Fleet Bank apparently prompted her to recuse herself from further involvement in decisions of the Comptroller’s office concerning the bank or its affiliates and, on May 13, 1993, then Mayor David Dinkins removed Fleet Securities as a co-manager on the bond issue. On August 2, 1993, the bank issued a demand to petitioner’s committee and to Holtzman, as guarantor, for immediate repayment of the outstanding loan principal. Petitioner and her committee finally reached an agreement with the bank in mid-August whereby the loan was extended and collateral was provided to secure the debt.
Based on these events, the Board charged petitioner with various ethical violations. After an 11-day hearing before an Administrative Law Judge at which over 150 exhibits were introduced and over 2,000 pages of testimony were taken, the Board concluded that by failing to recuse herself from the process of selecting managers on the City bond issue and, concomitantly, taking advantage of the quiet period to postpone loan repayment negotiations with Fleet, petitioner had violated section 2604 (b) (2) and (3) of chapter 68 of the New York City Charter, which define prohibited conflicts of interest on the part of public officials. Pursuant to the authority expressly granted to it in the Charter, the Board imposed a $7,500 fine on petitioner (see, NY City Charter § 2606 [b]).
Petitioner then commenced the instant CPLR article 78 proceeding, arguing that the Federal Election Campaign Act (2 USC § 453 et seq.) preempts application of the City Charter in this proceeding, and that the Board erred, on the law and the facts, in finding a violation of the City’s conflicts of interest rules. The Appellate Division confirmed the Board’s decision in all respects and dismissed the proceeding (240 AD2d 254). We granted petitioner leave to appeal, and now affirm.
I.
Turning first to the threshold question of whether the Federal Election Campaign Act (FECA) limits the Board’s jurisdiction here, we begin with the presumption that Congress did not intend to preempt the States’ power to regulate matters of local concern (see, Medtronic, Inc. v Lohr, 518 US 470, 484-485; New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co., 514 US 645, 654-655; California v ARC Am. Corp., 490 US 93, 101), and then analyze whether this presumption is overcome by either an explicit or implicit manifestation of congressional preemptive intent in *495 this case (see, Guice v Schwab & Co., 89 NY2d 31, 39, cert denied 520 US 1118; see also, Matter of Delta Air Lines v New York State Div. of Human Rights, 91 NY2d 65, 70-71). Implied preemption may be established when “the Federal legislation is so comprehensive in its scope that it is inferable that Congress wished fully to occupy the field of its subject matter (‘field preemption’), or because State law conflicts with the Federal law” (Guice v Schwab & Co., supra, at 39; see, Barnett Bank of Marion County v Nelson, 517 US 25, 30-31).
Here, no express intent to foreclose State prohibitions of ethical misconduct by local officials is discernible from the language of FECA. That act provides:
“The provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal Office” (2 USC § 453 [emphasis supplied]).
Thus, on its face, the statute’s preemptive reach appears subject-specific, restricted to the regulation of the conduct and financing of campaigns for Federal elective office (see, Stern v General Elec. Co., 924 F2d 472, 475; see also, Matter of Delta Air Lines v New York State Div. of Human Rights, supra, 91 NY2d, at 71).
Nor is FECA so pervasive that it reveals congressional intent to displace all ethical regulation of State and local officials while those officials are seeking election to Federal office. Indeed, the legislative history of the act supports the contrary:
“It is the intent of the conferees that any State law regulating the political activities of State and local officers and employees is not preempted or superseded by the amendments to title 5, United States Code, made by this legislation” (S Conf Report No. 1237, 93d Cong, 2d Sess, reprinted in 1974 US Code Cong & Admin News 5618, 5669 [emphasis supplied]).
Although FECA “occupies the field with respect to reporting and disclosure of political contributions to and expenditures by Federal candidates and political committees” (see, id., at 5668), it does not prohibit other State regulation, such as “the manner of qualifying as a candidate, or the dates and places of elections” (id.), or a “[Candidate’s personal financial disclosure” (11 CFR 108.7 [c] [5]). Thus, it is apparent that Congress did *496 not intend FECA’s preemptive scope to reach official conduct discrete from Federal election fund raising, such as a City’s ethical prohibitions (see generally, Stern v General Elec. Co., 924 F2d, at 474, supra [holding that Congress did not intend to occupy the entire field of corporate political spending]).
Finally on the preemption issue, the Charter provisions under scrutiny here are not in conflict with FECA. “Implied conflict preemption may be found when it is impossible for one to act in compliance with both the Federal and State laws, or when ‘the state law * * * “stan[ds] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” ’ ” (Guice v Schwab & Co., supra, 89 NY2d, at 39 [quoting Barnett Bank of Marion County v Nelson, supra, 517 US, at 31]). Here, the Charter provisions did not preclude petitioner, as a Federal candidate, from obtaining the loan, conduct which FECA expressly permits, but simply prohibited her from continuing to assert authority over a City decision in which her creditor was acutely interested. Unlike a State statute or regulation that directly conflicts with FECA’s disclosure requirements and spending limits (see, Bunning v Commonwealth of Ky., 42 F3d 1008, 1012; Weber v Heaney, 995 F2d 872, 876) the City’s ethics laws do not limit petitioner’s ability to fund her campaign and in no way infringe upon FECA’s control over Federal campaign contributions and expenditures (see, Reeder v Kansas City Bd. of Police Commrs., 733 F2d 543, 545-546 [Missouri law forbidding police officers to make campaign contributions not preempted]; Pollard v Board of Police Commrs., 665 SW2d 333, 338 [Mo] [same], cert denied 473 US 907; cf., Teper v Miller, 82 F3d 989, 995 [State ethics law having the effect of limiting Federal fund raising preempted by FECA]). Indeed, the only conduct for which petitioner was sanctioned occurred after her race for Federal office had ended.
Thus, concluding that the New York City Charter’s conflicts of interest prohibitions are not preempted by FECA, we turn to petitioner’s substantive arguments.
II.
Petitioner alternatively asserts that the Board erred in finding a violation of section 2604 (b) (3),* which provides:
“No public servant shall use or attempt to use his *497 or her position as a public servant to obtain any financial gain, contract, license, privilege or other private or personal advantage, direct or indirect, for the public servant or any person or firm associated with the public servant” (NY City Charter § 2604 [b] [3] [emphasis supplied]).
Petitioner claims that there was no factual basis upon which the Board could have concluded that she received an advantage from the imposition of the quiet period. The Board, however, readily could have inferred from the previously cited facts that the quiet period, in tandem with the pendency of Fleet’s application to be appointed to a comanager position (over which petitioner officially and ostensibly retained authority), effectively forestalled Fleet’s debt collection efforts for nearly three months. Thus, there was substantial evidence to support the Board’s finding that petitioner obtained a personal advantage within the meaning of section 2604 (b) (3) (see, CPLR 7803 [3]; Matter of Jennings v New York State Off. of Mental Health, 90 NY2d 227, 239).
Similarly unpersuasive is petitioner’s claim that imposition of the quiet period, to thereby inhibit Fleet’s collection-motivated communications with its debtor, did not constitute a use of her public office for which she should be held responsible. That this was a use of the Comptroller’s power is indisputable, as the policy was created by petitioner in her capacity as Comptroller and carried out by her staff.
Nor is this conclusion obviated, as petitioner contends, because the Board did not explicitly make a finding that she actually was aware that Fleet’s collection efforts had been deterred in this fashion. A City official is chargeable with knowledge of those business dealings that create a conflict of interest about which the official “should have known” (see, NY City Charter § 2604 [a] [6]). During her campaign, and at a campaign-related event, petitioner had been present on at least one occasion where Fleet importuned to become a comanager. Moreover, there is no dispute that members of her staff, including her top aide and former campaign manager, knew that Fleet responded to the RFP and, on prior occasions, had discussed with Fleet its ambition to increase its business dealings with the City. Petitioner also personally signed the Tombstone notice. Thus, it was hardly unreasonable for the Board to have concluded that petitioner at the least should have known that Fleet was an applicant for a managerial role in the next issuance of the City’s bonds, to whom her all- *498 pervasive quiet period rule would necessarily have been applied.
Further, as to whether she should be charged with knowledge of the application of the quiet period to postpone Fleet’s efforts to collect the debt, petitioner has not challenged the testimony of the Fleet officer that she was sent a copy of the February 12, 1993 letter, addressed to her campaign committee, expressly stating that the imposition of the quiet period prevented ongoing discussions for repayment of the loan. Moreover, it is reasonable to expect that she would have been alerted that the quiet period rule had been invoked against Fleet Bank’s collection efforts in view of the loan department’s otherwise inexplicable postponement without date of the January meeting that petitioner and the bank had agreed to on December 15, and its failure to take any action on the loan, not even contacting her, after the loan again went into default on February 1, 1993. Her only explanation for her inattentiveness to these facts was that she does not generally read mail merely copied to her (as to the February 12 letter), and that she may have psychologically blocked out the immediacy of the Fleet debt obligation and the bank’s earlier collection efforts. Thus, she exhibited, if not actual awareness that she was obtaining a personal advantage from the application of the quiet period to Fleet Bank, at least a studied indifference to the open and obvious signs that she had been insulated from Fleet’s collection efforts.
Under the foregoing compelling circumstances, the Board could reasonably read the Charter’s conflicts of interest provisions to authorize charging petitioner with notice of, and responsibility for, the use of her quiet period rule to obtain an advantage through her public office regarding deferred collection of her Fleet debt. Indeed, any other conclusion would inevitably undermine enforcement of this important statutory scheme “to preserve the trust placed in the public servants of the city * * * [and] to protect the integrity of government decision-making” (NY City Charter § 2600). Thus, the Board’s interpretation in this respect was entirely reasonable and consistent with legislative purpose.
We also find no merit to petitioner’s arguments that section 2604 (c) (3) exempts her conduct from the conflicts of interest rules. That provision states that the Charter does not prohibit “a public servant from obtaining a loan from any financial institution upon terms and conditions available to members of the public” (NY City Charter § 2604 [c] [3]). As discussed above, *499 petitioner was not sanctioned for obtaining the loan, but for failing to recuse herself from the management team selection process while then availing herself of the quiet period. These activities clearly are not within the scope of the section 2604 (c) (3) exemption.
Finally, petitioner’s assertion that the City Charter provisions were insufficient for due process purposes to give her adequate notice that the conduct at issue here was prohibited is unpreserved for our review. Petitioner’s remaining arguments are either unpreserved or wholly lack merit.
Accordingly, the judgment of the Appellate Division should be affirmed, with costs.
Chief Judge Kaye and Judges Titone, Bellacosa, Smith, Ciparick and Wesley concur.
Judgment affirmed, with costs.

 Although petitioner also was found to have violated section 2604 (b) (2), she does not challenge that determination here except insofar as she argues that the City Charter provisions, in general, are inapplicable to her conduct.