Council of the City of N.Y. v Adams (2025 NY Slip Op 25141)

[*1]

Council of the City of N.Y. v Adams

2025 NY Slip Op 25141

Decided on June 12, 2025

Supreme Court, New York County

Rosado, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on June 12, 2025
Supreme Court, New York County

The Council of the City of New York, Plaintiff-Petitioner, 
 For a Judgment Under Articles 30 and 78 of the Civil Practice Law and Rules

against
Eric Adams, in his official capacity as Mayor of the City of New York, 
 RANDY MASTRO, in his official capacity as First Deputy Mayor, and the 
 NEW YORK CITY DEPARTMENT OF CORRECTION, Defendants-Respondents.

Index No. 154909/2025

For Plaintiff-Petitioner: Katherine Rosenfeld, Esq., Daniel J. Kornstein, Esq., Daniel Matza-Brown, Esq., Nwamaka Ejebe, Esq. and Hafsa S. Mansoor, Esq.
For Defendants-Respondents: Rolando T. Acosta, Esq., James M. Catterson, Esq., and Danielle Stefanucci, Esq.
For amicus curiae New York City Anti-Violence Project: Ryan A. Partelow, Esq.
For amici curiae New York City Council Members Robert Holden, Vicki Paladino, and Inna Vernikov: Claude M. Millman, Esq.
For amici curiae The Legal Aid Society, Office of the New York City Public Advocate, Bronx Defender Services, Immigrant Children Advocates' Relief Effort, Immigrant Defense Project, LatinoJustice, Make the Road New York, New York Civil Liberties Union Foundation, Neighborhood Defender Service of Harlem, New York County Defender Services, New York Legal Assistance Group, New York Immigration Coalition, Queens Defenders, and UnLocal: Meghna Philip, Esq.

Mary V. Rosado, J.

The following e-filed documents, listed by NYSCEF document number (Motion 001) 13, 17, 18, 19, 21, 22, 23, 24, 25, 30, 32, 34, 35, 39, 52, 53, 54, 55, 69, 70, 71 were read on this motion to/for INJUNCTION/RESTRAINING ORDER.
Upon the foregoing documents, and after oral argument, which took place on June 3, 2025, where Katherine Rosenfeld, Esq., Daniel J. Kornstein, Esq., Daniel Matza-Brown, Esq., Nwamaka Ejebe, Esq., and Hafsa S. Mansoor, Esq. appeared for Plaintiff-Petitioner the Council of the City of New York ("Plaintiff-Petitioner"); Rolando T. Acosta, Esq., James M. Catterson, Esq., and Danielle Stefanucci, Esq. appeared for Defendants-Respondents Mayor Eric Adams ("Mayor Adams"), First Deputy Mayor Randy Mastro ("First Deputy Mayor Mastro"), and the New York City Department of Correction ("Department of Correction") (collectively "Defendants-Respondents"); Claude M. Millman, Esq. appeared for Amici Curiae Council Members Robert Holden, Vickie Paladino, and Inna Vernikov; Ryan A. Partelow, Esq. appeared for Amicus Curiae New York City Anti-Violence Project, and Meghna Philip, Esq. appeared for Amici Curiae The Legal Aid Society, Office of the New York City Public Advocate, Bronx Defender Services, Immigrant Children Advocates' Relief Effort, Immigrant Defense Project, LatinoJustice, Make the Road New York, New York Civil Liberties Union Foundation, Neighborhood Defender Service of Harlem, New York County Defender Services, New York Legal Assistance Group, New York Immigration Coalition, Queens Defenders, and UnLocal, the Court grants Plaintiff-Petitioner's motion seeking a preliminary injunction enjoining Defendants-Respondents and any of their agents and all New York City government officials, officers, personnel and agencies from taking any steps to facilitate the presence of federal law enforcement personnel on any property controlled by Department of Correction as contemplated in Executive Order No. 50 pending the resolution of this proceeding.
I. Background
A. New York City Charter Chapter 68
New York City Charter Chapter 68 recites that "[p]ublic service is a public trust" and places prohibitions on the conduct of public servants "to preserve the trust placed in the public servants of the city, to promote public confidence in the government, [and] to protect the integrity of government decision-making" (N.Y.C. Charter § 2600). Chapter 68 is a modern reiteration of conflict-of-interest laws which have existed in this State for well over a century (see, e.g. Smith v City of Albany, 61 NY 444, 446 [1875]). The Court of Appeals, 150 years ago, stated that conflict of interest rules "are of necessity, which the test of experience has rendered inflexible" and they "interpose a preventive check" against "men of feeble morals or hackneyed in the common devices of worldly business . . . which would betray them into gross misconduct and even into crime" (Smith, supra). The New York City Charter's codification of this rule is found in § 2604(b)(3), which provides "[n]o public servant shall use or attempt to use his or her position as a public servant to obtain any . . . privilege or other private or personal advantage, direct or indirect, for the public servant . . . ." 
A Conflicts of Interest Board with five members exists pursuant to New York City Charter § 2602. Three of those members are appointed by the Mayor of the City of New York, one by the Public Advocate, and one by the Comptroller — and all members are appointed with the advice and consent of the New York City Council (N.Y.C. Charter § 2602[a]). Pursuant to New York City Charter § 2603, the Conflicts of Interest Board can investigate alleged violations of Chapter 68 and has the power to fine violators of Chapter 68, void transactions violative of Chapter 68, and require the violator to forfeit the transaction (N.Y.C. Charter § 2606).
However, the Charter does not give the Conflicts of Interest Board the ability to issue injunctions or restraining orders. Nor is there any language in the Charter stating the Conflicts of [*2]Interest Board is the exclusive forum for resolving alleged conflicts of interest. Nor is there any written requirement that a party alleging a conflict of interest must exhaust administrative remedies at the Conflicts of Interest Board prior to seeking relief in Supreme Court.
B. Mayor Eric Adams' Criminal Prosecution and Executive Order No. 50
This case, at its essence, seeks to maintain the rule of law. Plaintiff-Petitioner seeks to nullify an Executive Order issued allegedly because Mayor Adams negotiated away sanctuary city protections for a dismissal of his ongoing criminal prosecution. On January 31, 2025, Mayor Adams met with President Donald J. Trump's Deputy Attorney General, Emil Bove ("Mr. Bove"), to discuss Mayor Adams' ongoing criminal prosecution's impact on his ability to "work[] with the federal government on important issues of immigration enforcement" (NYSCEF Doc. 73 at ¶ 31). Danielle R. Sassoon, Esq., Acting United States Attorney for the Southern District of New York, attended the January 31, 2025 meeting, and said "Adams'[] attorneys repeatedly urged what amounted to a quid pro quo, indicating that Adams would be in a position to assist with [immigration] enforcement priorities only if the indictment were dismissed" (NYSCEF Doc. 4 at p. 3 n.1).
On February 3, 2025, Mayor Adams' criminal defense attorney, Alex Spiro, wrote to Mr. Bove that Mayor Adams' criminal prosecution will "become increasingly problematic as the Trump administration seeks to aggressively enforce immigration laws and remove undocumented immigrants . . . .[T]he federal government cannot possibly rely on Mayor Adams to be a fully effective partner in all situations in ongoing public-safety missions while he is under federal indictment . . . " (NYSCEF Doc. 5). Mr. Spiro further wrote that Mayor Adams' "abilities to exercise his powers have also been complicated by his indictment" including his powers to "prevent[] the Office of the Corporation Counsel from litigating challenges to immigration enforcement, prevent[] appointed city employees from taking public stances against enforcement efforts, [and to] re-open[] the ICE office on Rikers Island . . . ." On February 10, 2025, Mr. Bove directed federal prosecutors to dismiss without prejudice the pending criminal charges against Mayor Adams (NYSCEF Doc. 73 at ¶ 34).
On February 13, 2025, just after meeting President Donald J. Trump's "Border Czar", [FN1]
Thomas Homan ("Mr. Homan"), Mayor Adams announced he would issue an executive order allowing federal immigration authorities on Rikers Island (NYSCEF Doc. 73 at ¶ 38). One day later, on February 14, 2025, Mr. Homan appeared alongside Mayor Adams on Fox & Friends, where he stated if Mayor Adams did not deliver "I'll be back in New York City, and we won't be sitting on the couch. I'll be in his office, up his b_ _ _, saying, 'Where the hell is the agreement we came to?'" (NYSCEF Doc. 73 at ¶ 39). That same day, the Department of Justice filed a motion to dismiss all pending criminal charges against Mayor Adams.
While the motion to dismiss was pending, numerous deputy mayors resigned from Mayor Adams' administration. On March 20, 2025, First Deputy Mayor Mastro was appointed by Mayor Adams (NYSCEF Doc. 73 at ¶ 47). On March 24, 2025, Mayor Adams issued Executive Order No. 49. This order provides First Deputy Mayor Mastro shall "[r]eport directly to the Mayor." (NYSCEF Doc. 10 at §2[a]). It also delegated to First Deputy Mayor Mastro the [*3]authority to "[p]erform any function, power or duty of the Mayor in negotiating, executing and delivering any and all agreements, instruments and any other documents necessary or desirable to effectuate any of the matters" related to public safety.
On April 2, 2025, United District Judge Dale Ho dismissed the criminal charges with prejudice, writing "[e]verything here smacks of a bargain: dismissal of the [i]ndictment in exchange for immigration policy concessions" (United States v Adams, — F.Supp.3d —, 2025 WL 978572 at *2 [SDNY 2025]). Judge Ho further wrote the suggestion "that public officials may receive special dispensation if they are compliant with the incumbent administration's policy priorities . . . is fundamentally incompatible with the basic promise of equal justice under law" (id.). Ultimately, Judge Ho found that he "cannot force the Department of Justice to prosecute a defendant" and did not have the authority "to appoint an independent prosecutor" which precluded him from denying the Department of Justice's motion to dismiss (id. at *2). Six days later, on April 8, 2025, First Deputy Mayor Mastro issued Executive Order No. 50, which authorized the Department of Correction to enter a Memorandum of Understanding with federal law enforcement agencies allowing them to maintain office space on Department of Correction property, specifically Rikers Island (NYSCEF Doc. 11).
C. This Action
On April 15, 2025 Plaintiff-Petitioner commenced this hybrid declaratory judgment and CPLR Article 78 proceeding (NYSCEF Doc. 1). That same day, Plaintiff-Petitioner moved, by Order to Show Cause, for a preliminary injunction, and a temporary restraining order enjoining Defendants-Respondents and their employees and agents from taking any steps to facilitate a federal law enforcement presence on Department of Correction property (NYSCEF Doc. 13).
The Court attempted to schedule a hearing on the request for a temporary restraining order on Friday, April 18, 2025. But Defendants-Respondents requested an adjournment. In order to retain outside counsel, Defendants-Respondents requested that a hearing be scheduled no earlier than April 25, 2025 (NYSCEF Doc. 23). Defendants-Respondents represented in the interim that they would not execute any Memorandum of Understanding pursuant to Executive Order No. 50.
Based on Defendants-Respondents' representation, this Court issued a temporary restraining order on April 21, 2025, restraining Defendants-Respondents from negotiating, signing, or implementing any Memoranda of Understanding with the federal government to facilitate federal law enforcement presence on Department of Correction property until the April 25, 2025 hearing (NYSCEF Doc. 24).
After hearing argument at the April 25, 2025 hearing, this Court signed Plaintiff-Petitioner's proposed Order to Show Cause and extended the temporary restraining order until the preliminary injunction hearing on June 3, 2025 (NYSCEF Doc. 30). Shortly thereafter, numerous community and legal organizations sought leave to appear as friends of the court, both in support and against the motion for injunctive relief (see generally Mot. Seqs. 002-004). This Court granted leave to each organization, and individual council members, who sought to appear as amici curiae. Prior to the injunction hearing, this Court e-mailed six written questions to the parties and the amici curiae to help frame pertinent issues at argument. On June 3, 2025, the parties and the amici curiae presented arguments for and against the requested preliminary injunction. After careful consideration of the arguments presented, and given the undisputed facts admitted in Defendant-Respondents' answer, the Court grants the application for a preliminary injunction.
[*4]II. Discussion
A. Standard
Whether to grant or to deny provisional injunctive relief is generally left to the discretion of the court, which must weigh a variety of factors (Nobu Next Door, LLC v Fine Arts Housing, Inc., 4 NY3d 839, 840 [2005]). A preliminary injunction may be granted where the movant demonstrates "a probability of success on the merits, the danger of irreparable injury in the absence of an injunction and a balance of the equities in their favor" (Doe v Dinkins, 192 AD2d 270, 275 [1st Dept 1993]). While a mandatory preliminary injunction requires the movant to show "a clear right" to the relief sought (see, e.g. Second on Second Café, Inc. v Hing Sing Trading, Inc., 66 AD3d 255, 265 [1st Dept 2009]), an injunction that merely prohibits certain behavior is not subject to this heightened standard (Bianculli v City of New York Office of Labor Relations, 216 AD3d 560, 561 [1st Dept 2023]). Moreover, where in the absence of a preliminary injunction the ultimate relief sought may be rendered inadequate, a movant need not show a certainty of success on the merits but must only make a showing of a likelihood of success (Republic of Lebanon v Sotheby's, 167 AD2d 142, 145 [1st Dept 1990]). Where human safety is at issue, or the loss of life, or a mistaken or unlawful deportation, may render ultimate relief inadequate, the proof required for injunctive relief is further reduced (Doe, supra at 275).
B. Forum
As a threshold matter, the Court must address whether this action is procedurally flawed for failure to go first to the Conflicts of Interest Board. To be clear, the Conflicts of Interest Board is the preferred and proper forum for many garden variety conflict of interest disputes, such as those involving improper gifts, failures to disclose financial interests, and other financial conflicts.
However, the Conflicts of Interest Board is not equipped with the powers and tools required to grapple with the case at bar, which involves the promulgation of an Executive Order at lightning speed, upending a decade of New York City policy barring federal law enforcement authorities from maintaining a presence on Department of Correction property (see Affirmation of Professor Peter Markowitz, NYSCEF Doc. 70). This Executive Order, which the Plaintiff-Petitioner alleges is the product of Mayor Adams' self-interest in obtaining dismissal of criminal charges in exchange for assisting the federal government's immigration agenda, has caused a ripple effect on thousands of New Yorkers and is impacting multiple organs of New York City government. The rapid developments leading up to this case, and the impact Executive Order No. 50 has on substantial sectors of New York City's population and government services, makes this case ripe for injunctive relief to preserve the status quo.[FN2]
The Conflicts of Interest Board does not have the power to grant injunctive relief, making it ill-equipped to adjudicate the conflict alleged here.
Requiring Plaintiff-Petitioner to first go to the Conflicts of Interest Board in this case is antithetical to New York City Charter Chapter 68's stated purpose to preserve the trust placed in the public servants of the city, to promote public confidence in the government, [and] to protect the integrity of government decision-making. This Court, which has the authority to issue injunctive relief, is the proper forum given the emergent nature of this action and the impact it has on thousands of New Yorkers.
Council Members Robert Holden, Vickie Paladino, and Inna Vernikov's argument that allowing injunctive relief in this case will weaken the New York City Conflicts of Interest Board and open the flood gates of litigation is therefore without merit. This Court finds that for the majority of garden variety conflict of interest disputes, the Conflicts of Interest Board is the preferred forum. But in extreme, rapidly unfolding cases, such as the case at bar, where the fruit of the alleged conflict has the potential to impact thousands of New Yorkers, the Conflicts of Interest Board is not the sole forum, nor must an administrative remedy first be exhausted prior to filing suit seeking a declaration that an allegedly conflicted action is null and void.
C. Likelihood of Success on the Merits
The Court finds there has been a requisite showing of a likelihood of success on the merits. New York City Charter § 2604(b)(3) provides that "[n]o public servant shall use or attempt to use his or her position as a public servant to obtain any . . . privilege or other private or personal advantage, direct or indirect, for the public servant or any person or firm associated with the public servant." Pursuant to the Court of Appeals, "[p]ublic policy forbids the sustaining of a municipal action [by] a member of the municipal governing body . . . which directly or immediately affects him individually" and in such a case the government action must be declared null and void (Baker v Marley, 8 NY2d 365, 367 [1960]). The test is "not whether there is a conflict, but whether there might be" (Titan Concrete, Inc. v Town of Kent, 202 AD3d 972, 975 [2d Dept 2022] quoting Matter of Tuxedo Conservation & Taxpayers Ass'n. v Town Bd. of Tuxedo, 69 AD2d 320 [2d Dept 1979]). The "[r]esolution of questions of conflict of interest requires a case-by-case examination of the relevant facts and circumstances" (Parker v Town of Gardiner Planning Bd.184 AD2d 937, 938 [3d Dept 1992]).
Plaintiff-Petitioner has shown a likelihood of success in demonstrating, at a minimum, the appearance of a quid pro quo whereby Mayor Adams publicly agreed to bring Immigration and Customs Enforcement ("ICE") back to Rikers Island in exchange for dismissal of his criminal charges. This showing is grounded in (1) Mayor Adams' public statements; (2) Mayor Adams' criminal defense attorney's written overtures to the Department of Justice; (3) the temporal proximity between these overtures and Mr. Bove's directive to dismiss the criminal charges against Mayor Adams; (4) statements from former Acting United States Attorney Danielle R. Sassoon and Assistant United States Attorney Hagan Scotten; (5) Mr. Homan's statement that he will "be in [Mayor Adams'] office, up his b_ _ _, saying, 'Where the hell is the agreement we came to?'" and (6) the written findings by United States District Judge Dale Ho.
Although Defendants-Respondents deny any quid pro quo in conclusory fashion, this is insufficient, and almost expected. As wisely stated by Justice Anthony Kennedy, the quid pro quo need not be stated in express terms "for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is [violative] if it is express or if it is implied from his words and actions . . . " (Evans v United States, 504 US 255, 274 [1992]). Based on the record, Plaintiff-Petitioner has made a sufficient showing of an implied, if not an [*5]express quid pro quo based on Mayor Adams, Mr. Spiro, Mr. Bove, and Mr. Homan's words and actions.
The issue, then, is whether Mayor Adams successfully recused himself from the execution of Executive Order No. 50, and whether the delegation to First Deputy Mayor Mastro cleansed the conflict and/or appearance of any conflict. There are two particularly instructive cases on this issue.
The first is the Court of Appeals' decision in Holtzman v. Oliensis, 91 NY2d 488 (1998). In that case, the former Comptroller of the City of New York, Elizabeth Holtzman, challenged a determination of the New York City Conflicts of Interest Board that she violated § 2604(b)(3). In 1992, while Ms. Holtzman was Comptroller, she ran in the Democratic primary to represent New York in the United States Senate. She obtained a $450,000 loan from Fleet Bank, an affiliate of Fleet Securities, Inc. to finance her media campaign and guaranteed the loan personally. The campaign was unsuccessful, and her loan went into default. In December 1992, the Comptroller's office issued a Request for Proposals for a new management team to underwrite New York City's bonds, and Fleet Securities responded. Fleet Bank subsequently extended Ms. Holtzman's loan until February 1, 1993, with an agreement to discuss a repayment schedule in January 1993. Ms. Holtzman designated one of her staff to oversee the Request for Proposals process, but she did not recuse herself from participating in selecting the new management team. On March 17, 1993, Fleet Securities was awarded a manager position, but once the media uncovered Ms. Holtzman's debt to Fleet Bank, Mayor David Dinkins removed Fleet Securities as a manager. Ms. Holtzman was charged with various ethical violations. The Court of Appeals found Ms. Holtzman was properly charged with a violation of § 2604(b)(3) and that her mere delegation to her employee to oversee the Request for Proposal process, without full recusal, was insufficient (Holtzman, supra at 499 [Ms. Holtzman "was not sanctioned for obtaining the loan, but for failing to recuse herself from the management team selection process."]).
The second case on point is Titan Concrete, Inc. v. Town of Kent, 202 AD3d 972 (2d Dept 2022). In that case, Maureen Fleming, the Kent Town Supervisor, admitted she had a conflict of interest with regard to a law on a zoning variance for an industrial plant. Ms. Fleming recused herself from voting on the law, but she "continued to preside over the public hearings, engaged in discussions with . . . the public on the matter, joined her colleagues in executive session, and voted on certain motions related to the local law." (Titan, supra at 974). Ms. Fleming did not procure an advisory opinion from the local ethics board concluding that her participation in the hearings was appropriate, and the Second Department found Ms. Fleming's "limited recusal was insufficient to remedy the appearance of impropriety which arose from her participation in the public hearings" (Titan, supra at 975).
These two cases are instructive for the following reasons. First, Holtzman shows that simply delegating oversight and management of a process to the conflicted official's underling is not enough to cleanse a conflict under New York City Charter § 2604(b)(3). Thus, according to Holtzman, Mayor Adams' delegation to First Deputy Mayor Mastro the authority to issue Executive Order No. 50 is insufficient to cleanse Mayor Adams' conflict, or the appearance of his conflict, pursuant to New York City Charter § 2604(b)(3). This is especially the case where First Deputy Mayor Mastro is not independent, but was personally appointed by Mayor Adams, and pursuant to Executive Order No. 49, directly reports to Mayor Adams.
To be clear, it is undisputed that Mayor Adams admitted he did not recuse himself. Juliet [*6]Papa, a reporter with 1010 WINS asked Mayor Adams "why he recused himself" to which Mayor Adams responded "I did not recuse myself. People play around with terminologies. I delegated. I'm the mayor" (see NYSCEF Doc. 85 — Transcript of Mayor Adams' Live Interview on 1010 WINS dated April 9, 2025). However, assuming, arguendo, that Mayor Adams did recuse himself, Titan Concrete instructs that his limited and belated recusal is insufficient. On February 10, 2025, Mr. Bove directed the criminal charges against Mayor Adams be dropped, and just three days later, on February 13, 2025, Mayor Adams, in a joint statement with Mr. Homan, stated on national television his intention to bring ICE back to Rikers. A public official with the appearance of a conflict of interest cannot cleanse the conflict by recusing himself after making it publicly known his desired outcome and delegating to his deputy. Nor have Defendants-Respondents stated that they sought an advisory opinion from the Conflicts of Interest Board prior to engaging in their delegation-execution spree, nor have they produced any advisory opinion in opposition to the application.
The Defendants-Respondents' hyperbolic argument that if Mayor Adams cannot delegate to First Deputy Mayor Mastro, then there is nobody he can delegate to, is without merit. First Deputy Mayor Mastro, although an accomplished and highly educated attorney, is not independent of Mayor Adams and therefore cannot be considered impartial and free from Mayor Adams' conflicts (see also Kirschner v KPMG LLP, 15 NY3d 446, 465 [2010] ["Agency law presumes imputation . . . "]). First Deputy Mayor Mastro reports directly to Mayor Adams, is appointed by Mayor Adams, and can be fired by Mayor Adams. He is Mayor Adams' agent. Based on the foregoing, the Court finds that Plaintiff-Petitioner has shown a likelihood of success in obtaining a declaration that Executive Order No. 50 is null and void.
D. Threat of Irreparable Harm
The Court finds that Plaintiff-Petitioner has demonstrated imminent and irreparable harm for purposes of obtaining a preliminary injunction. The harm to intangible assets such as damage to reputation, loss of goodwill, and brand tarnishment are routinely found sufficient to grant injunctive relief (see, e.g. Asprea v Whitehall Interiors NYC, LLC, 206 AD3d 402, 403 [1st Dept 2022]; CPTS Hotel Lessee LLC v Holiday Hospitality Franchising LLC, 171 AD3d 484, 485 [1st Dept 2019]). New York City, which thrives as a global hub due in large part to its reputation as being a welcoming home for immigrant communities from around the world, risks having this goodwill and invaluable reputation irreparably damaged as a result of an Executive Order borne out of Mayor Adams' alleged conflict of interest. New York City, through legislation and decades of policy, has established a reputation as a "Sanctuary City." This reputation, and the goodwill built from decades of policy decisions, and which have provided New Yorkers with numerous intangible cultural and economic benefits, risks being irrevocably tarnished. The harm to New York City's reputation as a Sanctuary City, and the goodwill with numerous communities that flows from that reputation, is best preserved through a preliminary injunction prohibiting Defendants-Respondents from acting on Executive Order No. 50.
Moreover, the imminent threat of the loss of public trust in government institutions serves as a basis for injunctive relief. The Court of Appeals has held that "the public's trust in government" is integral to "our constitutional design" (Cuomo v New York State Commission on Ethics and Lobbying in Government — NE3d —, 2025 NY Slip Op. 00902 at *4 [2025]). "Retaining public trust is essential for our government to function effectively and secure the freedom of its citizens, and thus is a paramount State interest" (Cuomo, supra at *9). [*7]"[D]emocracy cannot thrive and institutions cannot function where the public perceives that government actors use their power to serve their personal interests rather than those of their constituents" (Cuomo, supra).
While Defendants-Respondents argued that this action is nothing more than "rhetoric bereft of facts" the Court finds the opposite. Plaintiff-Petitioner, along with the amici curiae, have sufficiently demonstrated the real and imminent risk that, absent an injunction, a loss of trust in New York City's government institutions from its immigrant communities is imminent (City & County of San Francisco v. Trump, 2025 WL 1282637 at *24 [N.D. Cal. May 3, 2025]; City of Los Angeles v. Sessions, 2018 WL 6071072 at *3 [C.D. Cal. Sept. 13, 2018]; City of Chicago v. Sessions, 321 F.Supp.3d 855, 877-78 [N.D. Ill. 2018] ["Trust once lost is not easily restored, and as such, this is an irreparable harm for which there is no adequate remedy at law"]). Plaintiff Petitioner and the amici curiae have presented evidence of the loss of trust and ongoing harms being faced by immigrant New Yorkers and New York government organs. For example, victims of domestic violence are afraid to call the police for fear of incarceration and deportation. Undocumented New Yorkers fear cooperation with local law enforcement, as any interaction could lead to being taken into ICE custody. Children who have undocumented parents miss school. (NYSCEF Doc. 71 at ¶ 4). Undocumented individuals who are sick forego medical treatment. (NYSCEF Doc. 71 at ¶¶ 2 and 4). But individuals who wish to live here legally and appear for Court dates are apparently being taken into custody. The loss of trust from communities at large in government institutions and local law enforcement, demonstrated by Plaintiff-Petitioner and the amici curiae, has and will continue to have grave and irreparable consequences for New York City.
The Court is also cognizant of threat of irreparable harm in a more concrete sense — that is the threat to detained New York State and City residents and their dignity. There is ample evidence that there is already a serious, imminent and ongoing risk that immigrant New Yorkers, and even foreign tourists to New York City, are being wrongfully detained. There are documented reports of individuals being deported to stranger third-countries, and New York City residents are taken into custody for expressing political views contrary to the federal government's agenda. Residents who are here seeking asylum are being deported to countries they claim to have previously faced persecution for their sexuality, politics, or religion. And this concrete harm flows to the Plaintiff-Petitioner.
Indeed, New York State has enshrined in Executive Law § 290(3) that:
"failure to provide . . . every individual within this state . . . an equal opportunity to enjoy a full and productive life . . . , whether because of discrimination, prejudice, [or] intolerance . . . not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants"
This provision is paralleled in Administrative Code § 9-101 (see also Syeed v Bloomberg L.P., 41 NY3d 446, 453-54 [2024]["The State and City are deprived of economic and civic contributions of those who are discriminatorily denied the opportunity to work in New York"]). Thus, pursuant to statute and the Court of Appeals, the threat posed to New Yorkers by the implementation and execution of Executive Order No. 50 is also a threat to New York City's governing institutions, including the City Council.
While Defendants-Respondents argue that the alleged harm is speculative and not imminent, the Court finds this argument to be disingenuous. This Court does not exist in a vacuum, nor is it blind to the daily barrage of judicial orders restraining the Federal Government's deportations, many of which have gone ignored or have been met with open scorn and perhaps even contempt from members of the federal government. Nor is this Court deaf to the horrific stories of citizens and immigrants residing here legally being wrongfully detained, or other immigrants being wrongfully deported due to a "mistake."
Based on the foregoing, Defendants-Respondents' argument that Plaintiff-Petitioner should have waited until a Memorandum of Understanding was executed prior to seeking injunctive relief is without merit. The Defendants-Respondents' interpretation of harm in the context of this case goes against logic. It is akin to the police telling a 9-1-1 caller that they will not assist a victim who calls while a burglar attempts to enter her house but will be helped once the burglar enters her house. The harms to individuals, government institutions, and New York City imposed by the issuance of Executive Order No. 50 and the alleged quid pro quo are real, ongoing, and imminent.
E. Balance of the Equities
Finally, the balance of the equities strongly favors Plaintiff-Petitioner. The preliminary injunction simply maintains the status quo, the same status quo that has existed since 2014 and throughout the entirety of Mayor Adams' tenure. This injunction does not prohibit New York City from cooperating with the federal government in deportation proceedings for undocumented individuals who are covered by judicial warrants and orders signed by federal or immigration judges (see also N.Y.C. Admin. Code § 14-154). Thus, because the preliminary injunction simply maintains the status quo, and Plaintiff-Petitioner has shown a likelihood of success on the merits of obtaining a declaration from this Court that Executive Order No. 50 is null and void, and given the evidence of Executive Order No. 50's harm to undocumented residents and their family, public trust, governing institutions' effectiveness, and the damage to New York City's reputation and goodwill, Plaintiff-Petitioner's application is granted (see also Community Service Soc. v. Cuomo, 167 AD2d 168, 172-73 [1st Dept 1990]).
Accordingly, it is hereby,
ORDERED that Plaintiff-Petitioner the Council of the City of New York's motion for a preliminary injunction is granted; and it is further
ORDERED that Defendants-Respondents, their agents, and all other New York City government officials, officers, personnel and agencies are prohibited from taking any steps towards negotiating, signing, or implementing any Memoranda of Understanding with the federal government regarding federal law enforcement presence on Department of Correction property until the final resolution of this proceeding; and it is further
ORDERED that within ten days of entry, counsel for Plaintiff-Petitioner shall serve a copy of this Decision and Order, with notice of entry, on all parties via NYSCEF.
This constitutes the Decision and Order of the Court.

Footnotes

Footnote 1:Mr. Homan's actual title is White House Executive Associate Director of Enforcement and Removal Operations.

Footnote 2:According to the former commissioner of the Mayor's Office of Immigrant Affairs, approximately one million New Yorkers live in a household with at least one undocumented New Yorker (NYSCEF Doc. 71 at ¶ 3). Moreover, approximately 40% of New Yorkers are foreign born.